**In The**

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-23-00044-CV**
_____

**IN THE INTEREST OF S.C.T.**

**On Appeal from the 279th District Court**
**Jefferson County, Texas**
**Trial Cause No. C-223,529-C**

**MEMORANDUM OPINION**

This litigation began when Mother filed a modification proceeding in a suit affecting the parent-child relationship ("SAPCR") pertaining to the parties' minor daughter, Sara.[1] Mother ultimately sought to reduce Father's expanded possession to supervised visitation, but requested that the parties remain joint managing conservators with Mother retaining the right to designate the child's primary residence and that she be given the exclusive right to make certain decisions for the child. Mother also sought to permanently enjoin Father from meeting with school

---

[1]For purposes of privacy, we refer to the child by a pseudonym and the parties by their relationship to the child. *See* Tex. Fam. Code Ann. § 109.002(d).

1

personnel, coming on school premises, contacting the child's medical or mental health providers, and attending the child's extracurricular activities. Father filed a counter-petition, seeking to be named sole managing conservator. After a protracted dispute that involved the trial court designating the matter as "high-conflict," the issues of conservatorship and who would be the primary conservator were submitted to a jury, while the trial court determined issues of possession, access, and the parties' rights and duties. The jury denied Father's requested modification to be appointed sole managing conservator and determined the parties should remain joint managing conservators with Mother retaining the exclusive right to designate the child's primary residence. The trial court then decided issues of possession, access, the parents' rights and duties, and attorney's fees.

The trial court signed an Order in Suit Affecting Parent-Child Relationship granting Mother's requested modification, incorporating the jury's finding regarding conservatorship and the trial court's determinations on the remaining issues. This included restricting Father's possession and access of Sara to fifteen-minute FaceTime visits on the first, third, and fifth Saturdays of every month but allowing for the possibility of additional visitation as mutually agreed by the parties. The trial court's Order also included a permanent injunction prohibiting Father from, among other things: (1) attending school activities, (2) contacting the child's teachers, (3) attending the child's extracurricular activities, and (4) contacting the child's medical

2

or psychological providers. The Order also required Father to secure any firearms during his periods of possession. The trial court issued extensive Findings of Fact and Conclusions of Law. In seven issues, Father appeals the trial court's Order. For the reasons discussed below, we will affirm the trial court's Order.

## I. Background and Procedural Posture[2]

### A. Initial Pleadings and Initial Temporary Orders

Mother and Father divorced in 2015, and the divorce decree named the parents joint managing conservators of Sara with Mother having the exclusive right to designate Sara's primary residence. Father was given expanded standard possession. In June 2019, Mother filed her Petition to Modify Parent-Child Relationship. On June 27, 2019, on Mother's application, the trial court signed a "Temporary Restraining Order and Order Setting Hearing for Temporary Orders" scheduling the temporary orders hearing for September 17, 2019. The trial court's temporary restraining order granted Mother's requested relief that Father be denied access during her periods of possession for Sara's school and extracurricular activities and undergo an updated psychological evaluation.

On July 26, 2019, Father filed Respondent's Original Answer pro se, which contains a general denial. Less than a month later, an attorney entered an appearance

---

[2]We limit our discussion of the background and procedural posture to those matters necessary to this appeal's resolution.

3

on Father's behalf. On August 29, 2019, Father filed his Counterpetition to Modify Parent-Child Relationship asking to be appointed as the person having the right to designate the child's primary residence and asking the Court to clarify that he can attend Sara's school activities, lunch at school, and extracurricular activities. On Father's application, the trial court also signed his Temporary Restraining Order and Order Setting Hearing for Temporary Orders and set it for hearing the same day as Mother's. On September 13, 2019, Mother filed Counterrespondent's Original Answer which includes a general denial and requests attorney's fees.

After the initial temporary orders hearing, on October 30, 2019, the trial court signed Temporary Orders in Suit to Modify Parent-Child Relationship. That temporary order essentially precluded the parents from interfering with the other parent's periods of possession and prohibited the non-possessory parent from: (1) being present at school drop-offs or pick-ups; (2) taking physical possession of Sara during the other parent's period of possession, including at games, practices, or medical appointments; (3) performing any act that causes Sara to be confused or upset during the other parent's period of possession; and (4) making derogatory comments about the other parent in Sara's presence or outside Sara's presence while attending Sara's activities, among other things. The trial court determined that the "case is a high-conflict case" and ordered the parties to use a parenting facilitator.

**B. February 2020 Temporary Orders Reducing Father's Visitation**

On January 27, 2020, Mother filed an Emergency Motion for Temporary Orders alleging that Father "engaged in conduct that could significantly impa[i]r the child's physical and emotional development and wellbeing." In her Emergency Motion, Mother asks that Father be excluded from possession and access to the child and that he submit to a comprehensive psychological evaluation as part of a court-ordered custody evaluation. Mother also asks that Sara remain exclusively in her possession until the trial court can conduct a hearing. Mother supported the Emergency Motion with her affidavit and the "Affidavit of Erica Duckworth, LPC."

In her affidavit, Duckworth states that she is Sara's counselor and fears for Sara's safety. She asserts that Sara "has been consistent in expressing her fear of her father . . . in describing his anger and aggressive behaviors in her presence, some bizarre behaviors towards her, his constant questioning [of Sara] about her mother, his constant recording of her mother, and his hatred of her mother." Duckworth describes a threatening incident where Father "showed up unannounced" in her office. Duckworth explains that due to Father's behavior, she took "unprecedented measures" for her safety, for her clients, and for her assistant. In her affidavit, Duckworth states,

> I am concerned about [Father's] anger, paranoia and ability to make rational decisions and am, therefore, very concerned for [Sara] while in his care. As a result of my experience with him, I understand more fully [Sara's] fear and anxiety. It is my recommendation that [Father's]

5

parenting time be suspended until further professional evaluation is complete and until it is determined that [Sara] will be physically and emotionally safe while in his care.

Mother likewise asserts she is concerned about Sara and describes that Sara is "depressed, stressed, fearful and exhausted . . . [h]er anxiety is off the charts." Mother complains about "too many episodes" of Father's "aggressive, angry, and inappropriate behavior[.]" Mother describes several examples of Father's poor behavior. Mother states that Father talks bad about Stepfather to Sara and "showed her a gun that he had for [Stepfather]." Mother alleges that Father was furious when Sara told Mother and the counselor about the gun and "browbeat her for telling[.]" Mother claims that Father's "behavior is escalating[,]" and she fears for Sara's physical safety and emotional and mental health. She asks that Sara stay in her custody until a custody evaluation is completed, including a psychological evaluation of Father.

On February 4, 6, and 7, 2020, the trial court held a three-day evidentiary hearing on Mother's Emergency Motion. On February 21, 2020, the trial court signed Temporary Orders clarifying the parties' rights and duties while the case was pending. The trial court also reduced Father's possession to two eight-hour periods on the first and third Saturdays of the month plus two ten-minute phone calls on the second and fourth Saturdays of the month. The trial court ordered that both parties: not make disparaging remarks about the other parent in the child's presence; not

6

video the other party; not video the child during the other parent's possession; and not question the child about events at the other parent's house. The Order also prohibited Father from appearing at Sara's school, appearing at any appointments, changing the child's appointments, and attending extracurricular activities except during his possession periods. The trial court also ordered the parties to submit to a child custody evaluation to be performed by Dr. Eryn Lucas.

## C. Father's Objection to Custody Evaluation and Amended Petition

In November 2020, Father filed his pro se Motion to Set Aside: Child Custody Evaluation.[3] Father complains that in 2018, psychological evaluations were conducted on both parties, and neither parent was deemed to be unfit. Among other things, he asks the trial court to remove the Order for a Child Custody Evaluation and to reinstate his possession and access.

Mother filed her Response to Motion to Set Aside: Child Custody Evaluation. In her Response, Mother notes that after a three-day temporary hearing in February 2020, the Court appointed Dr. Lucas to conduct a child custody evaluation. Mother alleges that after hearing evidence at a prior hearing, including testimony from two of Sara's counselors, the Court modified Father's parenting time and ordered the

---

[3]In April 2020, Father's first attorney filed his "Motion for Withdrawal of Counsel." In June of 2020, the trial court granted the Motion for Withdrawal. In May 2021, a new attorney began representing Father.

custody evaluation. Mother states that "[u]pon information and belief, [Father] voiced his 'objections to Dr. Lucas, who then declined to conduct the evaluation.'" She asserts that Father spent the intervening months filing numerous pro se motions "about everything but the child custody evaluation and numerous grievances against the professionals involved in the case," and "has succeeded in deterring . . . Dr. Lucas' . . . participation in this case."

Mother explains that Dr. Carmen Kaimann previously evaluated Father and noted his "intensely angry feelings" which he may express "in aggressive behavior" and that she found Father obtained a "quite high score" on the MMPI-2 Clinical Scale for Paranoia. Mother contends that given Dr. Kaimann's "disturbing findings regarding [Father], and the level of conflict between the parties, . . . an in-depth comparative evaluation of the parents" would aid the court, and asks that Father's request to set aside the order for a child custody evaluation be denied.

Father subsequently filed his Amended Motion to Set Aside: Child Custody Evaluation. On December 7, 2020, the trial court signed an Order Denying Respondent's Amended Motion to Set Aside Child Custody Evaluation but appointed Dr. Kit Harrison as the new custody evaluator. The trial court ordered that the evaluation include psychometric testing of the parties, if necessary, and that the evaluator prepare a written report.

On January 26, 2021, Father filed his pro se Counter-Petitioner's First Amended: Counterpetition to Modify Parent-Child Relationship. In that pleading, Father asks to be appointed the person who has the exclusive right to designate Sara's primary residence and to be named Sara's sole managing conservator.

**D. February 2021 Temporary Orders Stopping Father's Visitation**

The next day, Mother filed her Motion to Modify Temporary Orders and for Extraordinary Relief, which she supported with her affidavit. Mother alleges that Father "has engaged in [] conduct that significantly impairs the child's physical and emotional development and wellbeing," as she outlines in her affidavit. Accordingly, Mother asks that the trial court modify its orders to temporarily restrain Father from possessing or accessing Sara pending further court order following completion of the custody evaluation. Mother alleges that Father is inflicting "emotional damage" to Sara and that her "emotional state is worse than it has ever been before." Mother states that Sara told her the previous week "she wished she had never been born." Mother alleges that Father tells Sara that Mother is "'mean' to him because I am trying to keep her away from him and that I am a 'liar.'" According to Mother, Father makes Sara repeat the phrase, "'Mommy is mean and Mommy lies.'"

Mother details Sara's behavior when she returns from Father's, including having "meltdowns" and crying "hysterically." She describes Sara being angry, frustrated, and aggressive. Mother also describes another incident where Sara threw

9

something across the room in frustration and accused Mother of being like her counselor, Duckworth, then began crying hysterically and apologized. Mother explains that she asked Sara to "draw her anger," and Mother attached the drawing to her affidavit. Mother states that when she drew the picture, she asked Mother, "please don't let him take me[.]" Mother claims that Sara has told her she was not "'her real Mom' and that I was 'fake.' She said she doesn't trust me but she doesn't know why." Mother outlines Sara's other recent behavior, including her refusal to go to her counselor because she was afraid someone would know she was there and that she insisted they wear disguises.

Mother also claims that Father "has engaged in a systematic campaign to eliminate the people from [Sara's] life that can help her." Mother describes how Father has attempted to do so. Mother states that Father "is critical of the Court on social media postings[]" and attached the social media postings. Mother states,

> It was very difficult for me to bring this information to the Court because of [Father's] likely retaliation against Sara. But, her statement that she wishes she had never been born and her extreme behavior are a cry for help. She's losing trust and confidence in herself and in those adults who are supposed to protect her. I am scared to leave her alone because it is that bad. I am asking the Court to protect her and help her at least until the report of the custody evaluation is complete.

Father responded on January 29, 2021, by filing a pro se Motion to Dissolve Temporary Orders and Extraordinary Relief, which he supported with an affidavit. Father "emphatically denies" Mother's allegations "regarding the safety and

10

welfare" of Sara. Father claims that Mother "is deranged" and that evidence will show "false statements and lies" regarding Mother's claims. He asks the trial court to dissolve the temporary orders.

In his affidavit, Father states, "I am [Sara's] Father and I am deeply concerned for her physical, emotional, and mental well-being while in the custody of [Mother]." Father alleges that two of Sara's counselors "engaged in unethical, unlawful, and egregious acts to take [Sara] away from me." He also accuses Mother of using "silver bullet tactics" that judges need to hear "to take a child from a loving and fit parent." Father claims that Mother has "filed frivolous, groundless, claimless, and harassing motions and affidavits" so the court would take Sara from him.

On February 12, 2021, the trial court held an evidentiary hearing on Mother's Motion to Modify Temporary Orders and for Extraordinary Relief. On February 25, 2021, the trial court signed Temporary Orders on Motion to Modify Temporary Orders finding that Father "is a danger to the child, [Sara], and that the child will be subjected to significant risk of physical or emotional harm if the child is in the presence of or has contact with Father." The trial court's modified temporary orders excluded Father from possession of and or access to Sara. The trial court also ordered that Sara exclusively stay in Mother's possession until Harrison completed his custody evaluation.

**E. Custody Evaluation and Father's Visitation Resumed**

On June 16, 2021, after performing his child custody evaluation, Harrison gave the parties and counsel a verbal report of his findings, conclusions and recommendations. According to Harrison, "[t]he parties declined the preparation and submission of the final written report at that time." Still, two days after Harrison provided his verbal report, Father filed a pro se Emergency Motion to Modify Temporary Orders and Set Mediation. In that Emergency Motion to Modify, Father makes representations about Harrison's findings, including that Sara resume visits with Father, was not afraid of Father, and that Duckworth exceeded her scope as a therapist by making any recommendation on possession and access based on any behavior that occurred in her office. He asks the trial court to follow Harrison's recommendations for re-integration visits and resuming the possession order.

On July 1, 2021, Father's attorney filed another Emergency Motion to Modify Temporary Orders and Motion to Compel Mediation urging the court to reconsider the temporary orders preventing him from having possession and access periods with Sara based on Harrison's recommendations. Several weeks later, Father filed Motion to Set [Father's] Motion for Emergency Motion to Modify Temporary Orders and Motion to Compel Mediation which he supported with his affidavit and other exhibits. In that Motion to Set, Father asserts that Mother has refused to cooperate with Harrison's recommendations, which is why he claims he filed the prior

Emergency Motion to Modify, but the trial court refused to schedule another temporary hearing absent a written report from Harrison. Father again asks that the trial court set the Emergency Motion to Modify Temporary Orders for hearing.

On July 28, 2021, Mother filed her "Response to [Father's] Motion to Set Emergency Hearing." She contends that the trial court ordered Harrison to prepare a report under Texas Family Code section 107.113, but Harrison has not done so. Mother argues that "without a written report, counsel does not have the information required by the Family Code, the basis for any opinions or recommendations, the results and interpretation of psychometric testing, information whether each basic element of a custody evaluation has been performed," or an understanding of his recommendations on possession and access. Mother also asserts that absent a report, Harrison should not be allowed to offer an opinion under Family Code section 107.109.

On October 19, 2021, Harrison completed his custody evaluation report and sent a letter to the trial court explaining that the parties did not authorize or request a written report until August 2021. Harrison's report outlines his methodology, lists documents and recordings he considered, summarizes his interviews with each parent and the child, discusses collateral witness interviews, describes the psychometric testing he performed, states his opinions regarding custody and parental behaviors, and specifies which parent should have certain duties. He also

describes conduct by two of Sara's counselors that he viewed as unprofessional and problematic in the context of determining possession and access since they had not performed custody evaluations, and states,

> Although [Sara] had legitimate worries and anxieties about [Father's] misbehavior, argumentativeness, verbal aggression toward mother, and loud verbal behavior, and observation of firearms in his possession and control, other contributory factors appear to have escaped scrutiny or therapeutic attention. By the same token, [Father's] concerns about the inappropriate application of clinical counseling methodologies were also largely justified, in that no child custody or access/possession evaluations could have remotely been conducted by Ms. Freeman or subsequent child therapists if, and when, they made forensic conclusions about future parent-child access/possession.

As for Mother, Harrison states that "it was difficult to disentangle pre-divorce issues from those occurring within the scope of the modification proceedings." He notes an incident Mother described before separation where Father became aggressive, grabbed her while she held Sara, threw things at her, and punched a hole in the wall. Harrison opines that Mother shows signs of emotional dyscontrol with her cheerfulness, but also shows signs of generalized anxiety. He also explains that she may be "unwilling to self-examine her role in difficult situations" and that testing showed "a slight mild subclinical elevation on feelings of suspiciousness, and a tendency to project blame onto other people[.]" Harrison opines, "That [Mother] had been interviewing and wood-shedding [Sara], exposing to undue influence, currently and in the past, seemed supported."

14

Harrison felt many of Father's skills "would be adaptive and a positive influence on the child." Harrison describes that during his visits, Father and Sara's interaction "was playful and casual, very affable and comfortable for both [Sara] and [Father]." He states that Sara "seemed legitimately happy and content to see him, consistent with other observer reports, but inconsistent with reports from [Mother]." Harrison opines that both parents have been significantly involved with Sara's care, "and evidence strongly suggests the child has loved and needed both parents[,]" and Sara "has shown characteristic and common emotional and psychological reactions when family conflict and co-parenting hostilities are in play."

Harrison notes a reported history of attention-deficit hyperactivity disorder (ADHD) for which Father took medication as a child. He explains that Father did not easily acknowledge his difficulties with "impulsivity, excessive verbalization, including demands that others maintain equally balanced harmony and an internal code of morality[,]" which "has often placed him in conflict with others, particularly his ex-wife." Harrison states that Father's "communication style has not been effective in his co-parenting with [Mother], and evidence will strongly support that he has been argumentative, hot-headed, and controlling at times with her in the presence of the child[.]" Harrison opines that "[t]hese problems are [Father's] fault, with which he does not readily agree." He adds that it is well supported that Father has been openly critical of Mother to others. Harrison explains, "It is the combination

15

of adult-ADHD impulsivity, coupled with strong irresistible urges to 'even things up,' correct perceived conversational and behavioral errors in others, and achieve symmetry and balance that get him in trouble with others in terms of his rather confrontational and argumentative communication style." Harrison describes Father's "clinical elevation on suspiciousness, which borders on paranoia, and reflects a strong conviction that his ex-wife and the Court system are out to 'get' him." Harrison also explains that Father has "trouble with insight in terms of his own personal role in his problems," and "may be willing to project blame on others" before examining his role. He states that Father has difficulty understanding the complexities of a problem and is very "cut and dried." He notes Father's "borderline elevations on Histrionic, Compulsive, and Negativistic personality traits." Father's tirelessness may result in "turbulence; he may become socially obdurate, inappropriate, and potentially caustic and assaultive." Harrison notes Father's tendency "to deprecate those who refuse to accept or enhance his superior self-image."

Dr. Harrison explains that Sara demonstrates "an Adjustment Disorder with Anxiety associated with family factors and disrupted access to one or both parents of the past months." He further opines,

> Although [Father's] verbal aggression and argumentativeness with mother and others has been highly contributory, there is no material evidence that he has physically harmed or abused the child. The mother is not alleging any form of family violence since the divorce which

16

would serve as a foundation for a termination or suspension of the parent-child relationship. The child did not make any outcries of physical or emotional harm as a result of [Father's] conduct with her during lengthy forensic interviewing. She did report she had been fearful of losing one or both parents, and in light of co-parenting hostilities, seems to have held fantasies that father might have done something in the past to harm mother, but she currently denied any actual fear of [Father] in recent history. The allegations of harm to [Sara] are more theoretical than actual, and the child remains happy and higher functioning. Further, mother's claim that the child is happy and higher functioning due to suspended access to father is not well supported either.

He explains that Mother attributed Sara's behavior issues and outbursts to Father, without accounting for other factors that would contribute to those issues, like her remarriage and the birth of new siblings in Mother's home. As to the harmful effects of Father's suspended access on the child, Dr. Harrison notes that "perceived abandonment by [Father] on the part of the child is also harmful to the child's emotional and physical development."

Harrison recommends that Mother be named as a joint managing conservator with the right to determine Sara's primary residence. Harrison also recommends that Father's possession and access resume and provides a schedule for implementing those visits, eventually culminating in a standard possession order. He states that neither parent should interrogate the child, rather a neutral court-appointed examiner should act as a monitor. He suggests that each parent undergo individual sessions with a parenting coordinator for improved parenting and parenting conduct and that "[Father] will need assistance with appropriate communication with professionals

17

working with [Sara] and he should be enjoined from negative communications with any person working with the child in any capacity." He also recommended the parties mutually select a mental health provider, psychiatrist for the child, medical, dental and other providers but each parent should be enjoined from seeking any form of child mental health services from other providers. Harrison says that Father "should be enjoined from personal contact with health care or mental health providers[]" and enjoined from taking Sara to the doctor except in an emergency. He concludes that Mother should have the exclusive right to make educational decisions for Sara, and although Father should have the right to obtain school record and documents, he "should be enjoined from personal meetings with school personnel[.]"

Finally, Harrison recommends that Father consult a psychiatrist about better management of his adult-phase ADHD issues, verbose and argumentative style with persons working with [Sara], and associated impulsivity. Father "should be required to comply with all treatment recommendations." He states that Father "certainly needs counseling on having a better 'filter' with regard to his verbally inappropriate statements noted[,]" and the "recommendation is made in the best interest of the child."

In late November 2021, Father filed his First Amended Motion to Modify Temporary Orders and Compel Reimbursement of Custody Evaluator Fees and set

18

it for hearing, citing Harrison's recommendations for resumed visits as the basis for the motion. After the hearing, on December 18, 2021, the trial court signed Interim Supplemental Temporary Orders noting that they were "necessary until the Amended Temporary Orders are drafted, approved as to form and signed by the Court." The Interim Supplemental Orders began reintegrating visits with Father by outlining supervised periods of possession and named a court-appointed supervisor. They also prohibited both parents from recording the child or other party, interrogating the child about the other party or other party's family, making disparaging remarks about the other party in the child's presence or hearing, discussing or permitting anyone else to discuss the litigation within the child's hearing, posting disparaging remarks about the other party on social media, sharing documents generated in the litigation with the child, and disciplining the child for referring to family members. On January 14, 2022, the trial court signed its Second Interim Supplemental Temporary Orders, providing for additional periods of supervised possession with Father, which contained the same prohibitions as the prior interim order.

In early February 2022, the trial court signed Temporary Orders in a Suit to Modify Parent-Child Relationship. The Temporary Orders outline the rights and duties of the parents consistent with Dr. Harrison's recommendations and carry forward similar prohibitions on the parties' behavior from the interim orders,

including not talking about the litigation to the child or disparaging the other parent to the child. The Temporary Orders provide a schedule for Father's visitation, with weekend possession resuming on March 7, 2022, and Father having extended summer possession. The trial court appointed a visitation monitor to assess Sara's progress on resumed visitation with Father but ordered that neither parent should have contact with the monitor except for routine scheduling or payments.

**F. August 2022 Trial Setting, Live Pleadings, and Mother's Emergency Motion to Modify Temporary Orders**

In June 2022, Father sent notice that the case would be tried beginning on August 22, 2022. Thereafter, Mother filed her First Amended Petition to Modify the Parent-Child Relationship, asking that the parties remain joint managing conservators, but that she be given certain exclusive rights, including, but not limited to, designating Sara's primary residence; communicating with Sara's school personnel; scheduling and consenting to Sara's medical, dental and surgical treatment, except in an emergency; consenting to and scheduling Sara's psychiatric or psychological treatments; attending Sara's extracurricular activities during Mother's periods of possession; and enrolling in extracurricular activities. Mother also sought a permanent injunction. Father filed his Second Amended Counterpetition to Modify Parent-Child Relationship asking to be named Sara's sole managing conservator, or alternatively, that he have the exclusive rights to: designate the child's residence; make decisions about medical, dental, and surgical

20

treatment involving invasive procedures; make decisions about the child's psychiatric and psychological treatment; and make educational decisions. Both parties requested attorney's fees.

On August 17, 2022, five days before trial, Mother filed another Emergency Motion to Modify Temporary Orders alleging that Father engaged in conduct that has significantly impaired Sara's physical and emotional development and wellbeing. Mother supported the Motion with her affidavit and the report of the court-appointed visitation monitor, Christy Mellen, LPC. Mother asks that Sara remain exclusively in her possession until a hearing can be held and alleges Sara wanted to kill herself rather than deal with Father. In her affidavit, she describes Sara telling her she wanted to kill herself and the accompanying screaming, crying outburst Sara had. She claims Sara reported Father has been discussing the litigation. Mother also references a video Father produced dated June 23, 2022, where Father violated the trial court's order by recording the conversation and discussing the litigation. She asserts that "[Sara] is in crisis and cannot handle" Father's "emotional abuse and manipulation."

Mellen's report, also attached as an exhibit to the Motion, describes that in consecutive visits, Sara "is visibly upset about spending time with dad[,]" and reports that "she 'feels like she can't be honest with dad.'" Mellen's report shows that Sara told her that despite loving Father, she does not want to see him and lied to

him, because she did not want him to be mad. Mellen explains that only recently, the child "feels comfortable enough to share her worries and concerns with this monitor[,]" and it is "directly correlated to an increase in visitation time spent with [Father]." Although Sara relayed to her that she was scared that Father carried a gun and pointed it at someone, Mellen did not believe Sara was in imminent danger, and given court orders, Mellen could not verify whether the incident occurred. Yet Mellen explains that "for a child to share a story in which a primary caregiver pointed a gun at someone (and express fear as a result of that) is disturbing whether or not the incident ever occurred."

The next day, at the pretrial hearing, the trial court considered Mother's Emergency Motion. Before the trial court granted the temporary emergency relief that the child remain in Mother's possession through trial, he explained that he was "not going to be responsible for a child harming themselves[,]" but allowed Father a chance to respond before ruling. Father noted Mother's history of "drummed up" allegations and pointed to Harrison's earlier report. The trial court granted Mother's request and noted that Father "openly disregarded" the orders prohibiting him from discussing the litigation with the child.

## II. Trial Evidence

The jury trial began on August 22, 2022. The jury considered: (1) whether Father should be named as sole managing conservator or the parties should remain

22

joint managing conservators; and (2) if the parties remained joint managing conservators, who would be the primary with the exclusive right to designate the child's residence. The trial court determined issues of possession, access, and rights and duties of the parties based on the trial evidence.

## A. Mother's Testimony

Mother testified that Sara was nine years-old and attended elementary school. Mother testified that she wants Sara to have "mentally healthy and safe parents[]" and wants "to protect her[;]" "she's been through mental and emotional abuse[.]" Mother and Father live about one or two miles apart. After their divorce, Mother had primary custody, and Father had expanded standard possession, which included first, third, and fifth weekends from Thursday when school got out until the following Monday when school resumed. After they divorced, Father did not treat Mother well; she described the behavior as "very disrespectful, name calling. I would chalk it up to disrespectful."

She explained that in the summer of 2017, she became concerned for Sara's emotional health. When Sara was four, she started throwing tantrums and repeating things when she returned from visiting Father. A video was played for the jury showing Sara having a tantrum upon returning from Father's house.

Mother testified that from the time Sara was four until she began counseling that

23

any time she would come home from his house she would be—she would have these emotional outbursts. She would want to lay in bed. She would complain of stomach aches. Her anxiety would be high. She looked depressed. She was just upset. And then that's whenever, you know, the episodes would happen; and she'd be so angry and irritable and frustrated. She would throw things. And, you know, there was a time where she ripped up all of her homework and threw nail clippers across the room. She would bite furniture. She would get so mad and just clinch her teeth together, and then she would cry hysterically.

Mother testified that in a day or two after those episodes, Sara would go back to normal and be "happy and silly and just full of light."

Mother said that in January 2019, when Sara was five, she decided to take Sara to counselor Jill Freeman and did so because she "knew she needed help." Mother denied that she had a legal agenda by taking Sara to a counselor or that she was attempting to alienate Father from Sara. She testified that Sara's anxiety and stomach aches, fits, throwing, and biting led her to seek help from Freeman, who Mother learned of from her counselor. During this time, Father had expanded standard possession, and Sara returned from his house with the same attitude. She never talked to Father about Sara's behavior, because she did not believe that he would respond positively; she just needed for Sara to talk to someone to help her and "was desperate."

Mother testified she did not tell Father that she hired Freeman, because she did not think he would provide any benefit to the counseling environment. Sara saw

Freeman for about four months, then Freeman sent a letter saying she could no longer see Sara but provided a list of counselors that may be able to see her.

Mother chose Erica Duckworth from Freeman's list, and in June 2019, Mother hired Duckworth. Eight days after hiring Duckworth, Mother filed the modification. Mother also denied that she hired Duckworth as part of a legal agenda or to alienate Father; instead, Mother testified she was trying to solve the problem. Sara saw Duckworth until November 2021, and it helped Sara cope with her emotions and problem-solving. Mother testified that in June 2019, a few weeks after she filed the modification, Father brought Sara to another therapist, who did not have any concerns about Sara. Father did not tell Mother about the other therapist.

When Mother got engaged, Father behaved unusually by cutting Sara's hair and piercing her ears, which upset Mother; the earrings were very uneven, so Mother took them out and did not allow Sara to wear them anymore. After Mother remarried, Father did not treat Stepfather well and noted things he said about Stepfather, like he was "nothing to [Sara]" and "no blood relation." This occurred in front of Sara "a couple of times," which made Sara "really anxious and nervous . . . she would withdraw . . . was confused."

Mother testified she filed the modification in June 2019, "Because of [Sara's] state of mind when she would come home from his house. It was just anxiety. And every doctor's appointment, dance practice, cheer practice, any extra-curricular

anything, . . . her level of anxiety was off the charts." Although these activities and appointments occurred on Mother's time, Father came to all of them, which Mother thought was "to take control." During Mother's possession periods, Father came to every school drop-off and pick-up.

When Mother filed the modification in June 2019, the first temporary orders prohibited Father from going to the school on Mother's time, but he could still go to dance and doctor's appointments. Father always came to the doctor visits, which Mother told him about in advance, and if there was a schedule for Sara, she let him know. Mother described Father's behavior at doctor's appointments, which included taking Sara off her lap and sitting with her on the opposite side of a waiting room, questioning Mother, and calling her a liar in front of Sara if Mother filled out paperwork. According to Mother, in the doctor's waiting room, Father also demanded a 50/50 custody arrangement and refused to talk to her about co-parenting unless she agreed. Mother did not agree to equal custody based on what she had seen and did not believe that was best for Sara. During this testimony, videos of Father at a doctor's appointment were introduced, which showed Mother comforting Sara and Father chastising Mother.

Mother testified that between February 2020 to January 2021 she sought to have Father's time reduced given Sara's anger, fear, confusion, and lack of trust after returning from Father's. Mother explained that in 2020, Sara's "major aggression

26

started where she would hit and throw things" and "get into these fits of anger and frustration and then hysterically cry." So, in 2020, Mother filed an emergency motion. Mother described how Father took control of Sara during her possession periods after dance and school. Father did so despite having expanded standard possession.

Mother described Sara's behavior that culminated in Mother filing the February 2020 emergency motion, including "tummy aches[,]" being "so angry and irritable and frustrated . . . filled with so much anxiety[.]" Additionally, Mother said Father yelled at Stepfather during a parent-teacher meeting at school. She testified that Sara "was not the normal happy carefree little girl any time that she was . . . coming home from being at [Father's] house." Based on what Sara came home saying, Mother attributed her tantrums solely to Father's household.

After a February 2020 hearing on the emergency motion, the judge reduced Father's visitation to two eight-hour visits per month with phone calls between. This reduced visitation lasted almost a year during which time Sara's behavior worsened, although Mother denied that cutting Father's visitation in half was disruptive to Sara. Mother believed that reducing Father's time would provide a solution to Sara's behavior. According to Mother, Duckworth testified at the hearing on the emergency motion where visitation was reduced. A few months later, in July, Sara went to the lake with Father during an eight-hour visit and returned upset; she refused to see

Duckworth and wet the bed that night. After that, Sara would not see Duckworth unless they wore disguises and used a different name. According to Mother, Sara "was losing trust and confidence in people that were helping her[.]" Mother testified that during this time, Sara said, "She wished she had never been born."

Mother explained the comment and disguises coincided in time and described another incident where Sara became enraged while working on homework, hitting Mother with a dishtowel. Sara wore a disguise the rest of the time she saw Duckworth and made Mother check their house for cameras, which Mother explained was because "her dad was always watching[.]" Mother explained that Father was constantly video recording everything.

After Sara began wearing disguises, stayed upset and continued having difficulties, Mother filed another request for temporary orders asking that Father's visitation stop "pending the custody evaluation." Mother said that the period after the reduced visitation began and until visitation stopped, Sara's behavior "was the worst it's ever been." After that temporary orders hearing, between January 2021 and December 2021, Father's visits stopped for almost a year. Once the visits with Father stopped, Sara became a "normal, happy child[,]" there were no outbursts, and she did not act anxious or upset. Mother disagreed that Sara suffered from feelings of abandonment during the eleven months Father had no visitation.

After the parties received the custody evaluation and additional hearings, Father's visitation resumed on April 25, 2022, where he had first, third, and fifth weekends. Mother said that when Father's visits resumed, Sara's behavior went "right back to the tantrums, the episodes, just angry . . . a lot of self-deprecation, like she was ugly and stupid . . . pulling hair and, like biting down on her teeth and just screaming and just so angry."

Mother described an incident that occurred two weeks before trial when her family took a trip to the lake and Sara became really upset and "wanted to take her own life[.]" She told Mother to "get him away from me. Don't let him take me[,]" and said she was scared of herself and refused to calm down. Sara told Mother she wanted to kill herself and go to Heaven because it would be better than dealing with her dad, and "if she could find a way she would because she hates feeling like this." Mother could not get her to calm down until 1:00 a.m. As a result of that episode, the week before trial, Mother filed another motion to stop Father's visits, and he has not seen her since. Mother testified that Sara improved but is still angry and frustrated.

Right now, Sara does not have a counselor, but Mother believes she needs one. Mother said she did not file these motions to remove Father from Sara's life but felt Sara needs "mentally healthy and safe parents[]" and "needs help." Mother believes that Sara has a healthy environment in her home but not in Father's. Mother

agreed that although they may not have the warmest feelings, "we . . . can still respect each other as [Sara's] parents." When asked what she wanted by filing the modification, Mother responded,

> I want [Sara] to have the help that she needs . . . I don't want [Sara] to have anxiety or question, you know, is my dad here, is my dad going to show up, are you sure . . . I don't want there to be anxiety around things like going to school and going to dance and going to the doctor the things that she repeats, which I know are hearsay, but the things that she comes home and says and repeats are not things that she should be saying or hearing.

Mother testified that she would like to remain the primary conservator under the custody arrangement.

After outlining the various motions, temporary orders, and visitation status Mother described specific examples of Father's behavior. These incidents included slapping Mother at the dance studio that resulted in her calling the police, him slapping another dance mom, behaving in a threatening way to Mother before a parent-teacher conference, speeding down their street and yelling after watching and waiting on them at a nearby gas station one night when Stepfather dropped them off while Mother was engaged, parking his car, watching them, and videoing outside Mother's parents' house on Christmas Eve. She described another incident that involved Sara having a medical procedure when she was younger, and Father taking her from Mother in the waiting area then making a rude comment about Mother's dad in front of Sara and others in the waiting area.

She testified about a lunchroom incident at Sara's school, where Father arrived when Mother and Stepfather brought her lunch. They invited Father to sit, but he stood over them and would not respond, so Mother and Stepfather decided to leave but left Sara's lunch, which Father threw in the trash. Father followed them out while recording and called Stepfather "the 'non-daddy.'" Two videos of this incident were played for the jury. Mother testified this occurred in December 2019, after she filed the modification, so she and Father were not on the best terms.

Mother explained that in February 2019, they had to take Sara out of dance, an activity she enjoyed, due to Father's behavior. Father had a confrontation with the dance studio owner, so the owner asked them to leave the dance studio. In September 2020, Sara resumed dance but was out of the activity she loved for about a year because of Father.

Mother testified about a time Father had a gun in "plain sight" in his truck, which she was uncomfortable with. She said firearms in both houses need to be secured.

Mother and Father agreed they would discuss it before Sara got a phone, but Father gave her a phone without talking to Mother about it. Mother explained that Father told Sara he would call her on her phone, but Mother turned the phone off and put it in the safe, because of the issues they had with Father recording. Mother was also concerned Father would track her on the phone, explaining there were times

31

he arrived where she was, but she did not know how Father knew her location. Mother's phone was available without restriction to Sara to call and receive calls from Father, which she communicated to him. Every time Father calls Sara, Mother gives her the phone, which is almost every day. She also returns Sara's phone with her when she goes to Father's.

As for Father's videos showing Sara running to him and hugging him, Mother testified this was typical behavior. She explained that Sara usually did not act afraid of Father in front of him but does when he is not present.

Mother was concerned about Father coming to school for pick-up, drop-off, and activities and described him taking Sara off the stage at a school play; he then walked past everyone, telling them "see you-all in court." Mother testified that anytime there is a parent-teacher conference, there is a confrontation. At a meeting with the school principal and assistant superintendent, Father was embarrassing, and Mother does not want teachers keeping Sara out their classes to avoid the drama. Once, Father brought a police officer with him to a school conference, but Mother did not know why.

Mother testified the current order requires the parents to stay in the car when they exchange Sara, which she believes is necessary. Despite that, Father has approached her vehicle. Additionally, Mother felt it was appropriate that they be ordered not to video, since Sara is aware when someone is videoing her, and it makes

her uncomfortable. Mother testified Father should not attend medical appointments except in an emergency. Mother also wanted the right to: (1) consent to medical and psychiatric treatment; (2) make education decisions; and (3) communicate with school personnel. She kept Father informed historically and did not have a problem continuing to do so. Mother felt it was best that Father not come to extracurricular activities on Mother's time, and she does not go to practices on his time but would like to attend big events like recitals.

She did not believe Sara would be better off without Father and denied telling Harrison otherwise but said that both parents need to be "mentally healthy and safe[.]" Mother testified that Father did not bring anything positive to Sara's mental or emotional health. Mother did not believe that Father did anything well as a parent for Sara, but Sara loved him.

Mother testified that in May 2019, Father filed an enforcement action against her for violating the right of first refusal provision, when she was out of town for work and had her mother watch Sara. She denied that she retaliated by filing the modification proceeding. Mother acknowledged calling the police on Father "a couple of times" and that none of them resulted in any convictions but said that he was dating a local police officer. Multiple police reports were admitted into evidence during this testimony. She also said that Father filed multiple police reports against her and threatened to file more.

## B. Father's Testimony

Father testified he wanted sole custody, the exclusive right to make all decisions about Sara, and Mother to pay child support. He believed there was a plot or conspiracy against him in the family court. Specifically, he believed actors operated inside the courts to get recommendations, including counselors, ad litems, attorneys, psychologists, and judges. He named Mother, Sara's counselors, and Mother's attorneys as being part of the plot against him. Father believed the trial judge went off recommendations but did not think the judge was involved in the plot, although Father made derogatory comments on social media about the trial judge. Father testified that he filed grievances against the counselors and Mother's attorneys plus perjury charges, all of which were no billed. Father said he would bring evidence in this case that they are all deranged liars. Among other things, Father said he wants to change custody because Mother alienated Sara and has "purposely driven a wedge to separate myself from her." Father testified that Mother "used professionals on a platform that violated codes and ethics and laws to set a wedge."

Father testified that he took responsibility for problems in co-parenting with Mother. He discussed an incident where he called police on Mother when she came to get Sara and testified that he did not engage in good coparenting then. He also agreed that it traumatized Sara to think Mother was going to jail.

Father did not take medication as recommended by Harrison and another psychologist. He claimed he sought counseling, but he provided no records supporting this claim.

During Father's testimony, he discussed the production of almost 5,000 videos he produced. He said he videoed to protect himself from lies and to capture "life experiences and happenings."

Father believes he should tell Mother how to parent "at times, when it warrants itself," although he admittedly "take[s] that a little too far at times." He felt they had different parenting styles and do not always agree. Father had called Mother a "joke" before, and Sara began calling Mother a "joke." He has also called her "dumb," "ignorant," and "clueless." During Father's testimony, text messages were admitted and read for the jury showing that he regularly called Mother a "liar" and "evil," which he asserted he had a "right" to do. He said that he took information to the grand jury about her lies, but the grand jury no billed the charges.

Father has questioned Sara about what goes on at Mother's. This included questioning while videoing Sara about a trip Mother took with Stepfather before they were married and asking her where everyone slept. Father testified he questioned Sara about this because he learned that Mother was engaged and said that "the stress of all this" gives him "tunnel vision."

He admittedly cut Sara's hair for the first time and pierced her ears without telling Mother the same weekend he learned of Mother's engagement but denied it was retaliatory. Father testified that Mother determined the holes in Sara's ears were uneven and removed the earrings but told Sara a "fairy" removed them, which Sara told Father. Father made a recording that was played for the jury, in which he told Sara to disregard what Mother said about the earrings and to "put them pretty earrings back in, Boogie, we're going to the mall to get some more earrings[.]" Sara told him she did not want to, which Father said was "fine" although the video shows he continued to question her about getting new earrings. Father admitted he heard the stress in Sara's voice on the recording and agreed he should not have put Sara in that position. Father then returned to Mother's to get the earrings and said on the video under his breath "You will pay the price for this."

Father denied violating the trial court's order by talking bad about Mother to Sara despite video evidence. Father testified that he did not believe bullying had a place in co-parenting, although his demands could be viewed that way. Father testified he denied Mother permission to fill out his name and address on forms at the doctor's office and was "very critical." He told Mother she should not list her parents or Sara's Stepfather as the first emergency contact and further criticized her for submitting Sara's school registration.

A text message admitted as evidence showed that Father made Sara erase homework if she completed it with Mother then made her redo it with him. Other messages admitted showed that Father complained about Mother taking Sara to church during her possession period, because she would be late for cheer practice. He testified that in his opinion, Mother should tell him when she was taking Sara to church during her possession periods. Father claimed Mother failed to communicate and keep him informed. Yet, he testified he sent her messages telling her to stop trying to communicate, and although he felt that her communication was "a lot of show[,]" that he "should have just let it be."

When photos were admitted of a semiautomatic pistol kept in his truck, he said he no longer keeps the gun in a cubby hole in his truck and instead, keeps it other places in his vehicle. Father denied that he pulled his firearm and pointed it at anyone but said he carries the gun everywhere to protect himself from evil. Father denied that Sara could ever reach out and grab one of his firearms.

Father testified that co-parenting with Mother has been a "roller coaster" and although they communicated in the beginning, over the last three years, they have been unable to do so because they remain in the courthouse. Father testified that for the last two years, he has been "completely shut off" and he is "not told things" and "couldn't ask." Father explained that the litigation and the lost time with Sara played a role in his communication style, and it was "[e]xtremely stressful[.]" Father rated

37

his ability to co-parent as a "4" on a scale of 1-10. He admitted there were times he failed as a co-parent to consider Mother's circumstances in another household with two more small children. Father considers himself supportive of Sara's educational goals, and said it was "very hard" to have an order preventing him from going to school, because he cannot influence her.

Father testified that Mother informed him of school events, though not "fully." Father testified that Mother also kept him informed of doctors' appointments, but she provided "absolutely no information" about counselors. Father offered examples of his positive co-parenting like inviting them for Christmas in 2016, buying Mother baby gifts for her children with Stepfather, coaching soccer together, and buying Mother's Day gifts.

As for a June 2022 video he recorded where he and Sara discussed a pool party, he said it was "[n]ot my best moment." If everything was taken out of context, Father admitted he looked like "a villain." Father said of the thousands of videos he produced, the other side picked the worst ones. Various videos were admitted showing positive interactions between Father and Sara. Father explained about one video of Sara telling him that she misses him, that she is in an "emotional state; and unfortunately when I have a path of trying to get information, I sometimes lose focus on the fact that she's just a kid and needs consoling at times." Father believes that even now, though, he has a good relationship with Sara.

Father testified there were derogatory comments on both sides and described text messages where Mother accused him of "lying" and being "sick." Father claimed that all Mother's calls to police were false. Despite the police calls, Mother never acted afraid of Father. Father felt Mother's report that he wanted to murder her husband and child was her "exaggerating things to start getting a leg up or at least start having heavier weight to her claims." He agreed his behavior toward Kim Ross, the dance studio owner, was inappropriate and that he made her uncomfortable.

Father testified that Mother violated the divorce decree's morality clause, and he filed an enforcement action against her over the right of first refusal clause. About two weeks later, Mother filed this case against him, which Father felt was retaliatory. Father claimed Stepfather taking Sara to school violated his right of first refusal and felt Mother was trying to replace him with Stepfather. He initially denied lying in wait for them at the gas station over the morality clause issue, yet he had his prior testimony to that effect read back to him.

Father did not know Mother hired Freeman to counsel Sara and felt he could have worked with the therapist. Father felt that Mother was not genuinely trying to solve a problem but had the ulterior motive of a legal agenda. Father testified that based on the audio from Freeman's sessions, he felt Freeman was dishonest in her reports. Father said he filed second ethics complaints against Freeman and

Duckworth after receiving Harrison's report. Mother hired Duckworth in June 2019 but did not tell him, instead he learned about Duckworth from a therapist he hired named Butler. He also does not believe Duckworth is honest. Despite this, Father admittedly hired Butler without telling Mother about her, which he said was wrong.

Father described the effects of the temporary orders cutting his visitation to two eight-hour Saturdays between February 2020 through January 2021, and then eliminating it between February 2021 and December 2021. Father did not feel the orders were good for Sara, and since Mother continued to report that Sara was depressed and unhappy, it did not work. Although Harrison told them about Sara having feelings of abandonment in June 2021, it was six months before Mother arranged any visitation.

Father testified that Sara has had too many therapists. Father said it was hard to listen to Mellen. He did not know how she was neutral and felt she grossly mischaracterized his time with Sara. He wanted Sara to "take a break" from therapy and "let her be a kid." He is confused by Mellen's testimony since many issues Sara relayed arose after Sara spent a week with him, and there were no issues.[4] He testified that the claims Sara wants to kill herself came from Mother and counsel, and while "concerning[,] . . . I have no record of that[,]" and "it's not easy to trust what mental health professionals are saying." He denied that his distrust of Mother

---

[4]*See* Mellen's testimony, *infra*.

outweighs concerns about their daughter wanting to kill herself. He testified that if he has primary custody, he is open to anything that is healthy for Sara.

## C. Dr. Kit Harrison's Testimony

The trial court appointed Dr. Kit Harrison to perform a custody evaluation in this case. Harrison testified he is a forensic psychologist, and his opinions meet the criteria of reliability and scientifically based. Harrison prepared a report, which outlined his methodology and materials he reviewed. Harrison testified that Mother has been the primary caregiver since the divorce, and he concluded Mother should keep custody of Sara as "a joint managing conservator with the right to determine the primary residence of the child[.]"

He said that the parties' conflicts often occurred during exchanges, and Sara showed understandable signs of anxiety. Father called police during exchanges, which amplified the child's anxiety, and she was increasingly reluctant to go for visits with Father, stating she was afraid of him. Dr. Harrison testified that Sara had legitimate worries and anxieties about Father, including the following specific areas: misbehavior; argumentativeness; verbal aggression towards Mother; loud verbal behavior; and observed firearms in his possession and control. He generally did not fault Mother for getting help for Sara given her anxiety and stress but had opinions about certain counselors' standard of care. Harrison relayed that the first counselor, Jill Freeman, testified she was so concerned for Mother's safety and her own safety

based on what the child reported that she went to the police. Harrison testified that Freeman "overstepped her bounds." He criticized Freeman because she came in as "a helping, therapeutic provider of services, developed an alliance with the child[,] . . . [a]nd issues got complicated, at which point an investigation would – would have been needed. And you can't do – you can't be a helper of a child and an investigator of a child." Harrison testified that Freeman reached out to law enforcement, which is an acceptable thing to do as a mandatory reporter.

Harrison's report also discussed Duckworth, whom he interviewed, and Duckworth had concerns about Sara's welfare. Duckworth reported that Sara told her: she was afraid of Father; he questioned her about Mother; Father hated Mother; she was concerned Father recorded Mother; and she sneaked to look at a gun in a drawer at Father's house. Duckworth herself reported being afraid of Father and expressed concerns about his anger, paranoia, and ability to make rational decisions. Duckworth also contacted law enforcement about Father and issued a cease-and-desist letter to him.

Harrison testified that evidence strongly supports Father was consistently argumentative, hot-headed and controlling with Mother in the child's presence, which has caused him to be an ineffective coparent; those problems are his fault, but Father disagreed. Harrison discussed Father's police reports being made in the child's presence and a recording where Sara asked Father if Mother is going to jail.

42

Harrison testified that when the recording was made Father was not engaging in good co-parenting, because he refused to return Sara although Mother allowed him extra time with Sara for his birthday, for the stated reason that Mother's sister was in the car.

He would not characterize Father as "a bully" but Father "wants things clear, straight, even perceived fairness, rigidity, demands that things be equitable, everything has to be above-board, even-Steven and I want what I deserve. In this world, that's a problem." Harrison testified Father is like that with everyone. He recommended that Father not be allowed to interact with school personnel, be allowed at medical appointments, or be allowed to attend extracurricular activities because of his "rigid, compulsive, detailed fixation, preoccupations with detail." Harrison testified that Father lacks necessary understanding and insight into his co-parent's post-divorce responsibilities. Harrison testified that Father projects blame onto Mother and others yet is unable to take responsibility for his actions.

Harrison criticized Mother for believing Father was the sole cause of Sara's problems and refusing to recognize that they were multifactorial. Harrison testified that Mother kept Father informed and did not criticize the "mechanics" of her parenting. Harrison testified that it was manipulative for Mother to hang all problems on Father, but it was "simpatico with her legal agenda[,]" and she interviewed Sara in a way that contributed to "undue influence to the anxiety," by suggesting Father

43

was the sole culprit. Harrison testified that Mother plays a role in Sara's issues but would not characterize it as equal. Harrison testified that Sara was a normal, happy child, with "risk factors" including anxiety and probable anxiety disorder but is basically a normal kid.

Mother told Harrison multiple times she felt that it was in the child's best interest to suspend Father's access and have no relationship with Sara, which Harrison disagreed with. Harrison determined that Mother villainized Father, and he believed that she coached and influenced the child against Father. Nevertheless, he testified that both parents have a legal agenda, and it was not a coincidence that Father took Sara to a therapist a month after the modification was filed and did not tell Mother. Sara told Harrison she did not know why she had not seen Father, which was "good" since it meant Mother did not speak to her about court.

Although Sara did not report fear of Father when Harrison saw her in the office, she had not seen Father in eleven months, and she did report being afraid of him in the past. Harrison agreed "a hundred percent" that what occurred after Father's visitations resumed is important regarding the issue of Sara's fear.

Harrison testified that saying Father was openly critical of Mother to others was an "understatement." He explained that Father expects things to go perfectly and expects Mother to be an ideal parent; he "fancies himself as an ideal father," and

44

when something does not go the way it should, Father feels someone is to blame for that.

Harrison discussed the June 2022 video Father recorded regarding a swimming party for dance and testified the video shows Father engaged in harmful parenting, noting "fundamental" thinking errors he exhibited. Harrison testified that the "videographic recording of the child is problematic per se[,]" and Father "wants to make documents to prove a point – he's not handling issues in the case the way that it's successful, which is counterproductive." Harrison explained that in the video, Father is more concerned about why he could not go to dance and telling Sara about it, which is harmful. He also opined that Father knows "that's a problem" and "he knows that it's a court order and he's dangerously close. He wants to tell her about Mommy's fault and the court order and the lies that people have told[.]" Harrison testified that it is concerning Father is telling the child everything, given what he thinks of Mother; you need to insulate the child from that, especially in an over-anxious child.

Harrison's report outlined Father's difficulty appreciating the emotional aspects of relationships and is "mostly" emotionally dismissive of Sara's feelings. Father told Harrison that when Sara gets older, he will tell her everything he thinks of Mother, which Harrison said is "not advised" and "can be potentially harmful." Harrison agreed that it would be harmful to a child for her father to tell her that her

that her mother is a deranged liar and alienates him. Harrison testified that "[y]ou could argue that" Father is a danger emotionally to Sara.

Harrison described Father as paranoid and someone who projects blame without examining his own contribution to problems. Consistent with his findings, Harrison knew that a previous psychological evaluator found Father to be high on the paranoia scale of MMPI-2, recording concerns, narcissistic, and had thinking disturbances with how to solve problems. Harrison recommended Father get help, specifically to see a psychiatrist for medication, because it would have "jaw-dropping effects" on helping him improve. He testified that Father's issues were "an atypical ADHD on steroids . . . that's readily treatable[.]" Harrison was unsurprised that Father failed to provide information that showed he followed recommendations to see a psychiatrist, get medication, and see a behavioral therapist, even though in three months, those things could make him a better parent. Harrison explained that Father's "biggest problem is verbal expression, verbal aggression. And there's a tic-like quality to it that . . . lives on the ADHD gene, all treatable. So, he's . . . in the group of parents that just can't inhibit verbal issues." He described "tics" as "[p]urposeful, irresistible urges to say stuff." Harrison testified that Father cannot turn off his personality traits – like being hot-headed, aggressive, paranoid, and angry – without help. Harrison testified that a nine-year-old child should not deal with that, and they can protect her through supervision.

46

Harrison testified that Father's rapidly shifting shallow emotions are "an obstacle" for someone who wants to be a primary parent, and while they should be concerned about Father, Harrison never felt he was a physical danger to Sara or Mother. Harrison testified that it was "concerning" that Sara says she would kill herself if she could find a way. He agreed that a lot had happened since he completed his report in June 2021, and Mellen should testify about what has happened since then and is in a better position to advise how Sara is doing, because he has not seen her in many months. Harrison recommended that

> Mom be named joint managing conservator with the right to determine the child's primary residence. Dad should have visitation.

> The court is going to make a determination, you know: Does [Father] need supervision? What kind of supervision? Does he need an off-duty officer to follow him around for him to be quiet? What's it going to take?

Ultimately, he recommended Sara and Father have their regular visitation from the divorce decree reinstated, "with the strings attached" in his report, including "a whole list of conditions like him getting treatment, monitoring the situation." Harrison explained, "the problem is verbal output from Dad that needs to stop and there's mechanisms to get that done. But in the scheme of things, this is not a termination case. It's not a case where a child should lose a parent. The . . . issues need to be addressed and fixed and move on."

**D. Christy Mellen's Testimony**

Christy Mellen testified that she is an LPC and the court-appointed visitation monitor. Mellen explained her job is to "effectively monitor [Sara's] visits with both her mom and her dad just to make sure that things were going okay." The trial court ordered Mellen to prepare a report concerning her visits with Sara and to have no contact with the parents nor their counsel other than routine scheduling and payment communications. A copy of Mellen's report was admitted into evidence.

Mellen testified she saw Sara eight times. She explained that in April 2022, Father's visits with Sara resumed, and late that month, she saw Sara the first time. Mellen noted in her report after the first visit, that Sara told her another counselor "had lied about what I said about my dad" but Sara could not remember more details when pressed.

Mellen explained their second visit occurred on May 24, 2022, after Sara's first weekend visit with Father. Father kept her until Monday and returned her to school. Sara reported to Mellen that she had been with Father and was upset the previous day at school, then left early to go to Mother's. Mellen said that when she asked why, Sara told her she could not remember and was "real reluctant" to provide details. Mellen testified this was consistent with a teacher's testimony about Sara being upset with tummy aches. That same day, Sara reported that "she was worried about some upcoming weekly visits over the summer because she would . . . miss

Mother and didn't really want to go to Father's for a week." Mellen testified that Sara had not spent a week with Father in a long time and "was just worried that she was really going to miss her mom."

Mellen next saw Sara on June 2. Sara mentioned that she saw Father on her birthday, then went to the lake with Mother. Sara also reported that she was happy to go to Father's but worried that "mom will not be okay without her." Mellen saw Sara again on June 15, and she was "very talkative and carefree." Sara told her she went to the beach with Father "but was becoming increasingly worried about spending extended time with him and being away from her mom." Mellen sensed that Sara's week-long visit with Father was approaching.

Mellen next saw Sara on July 11, and she testified that "was the first visit in which she was like, visibly upset about having spent time at her Dad's and she wanted me to know that she was 'very upset.'" Mellen testified that Sara "was very upset that her dad had been recording her conversations with her mom. She stated that she doesn't think, quote, that it was right and doesn't want him to do it." Mellen noted that Sara recalled a past incident in which multiple people were picking her up from school and Father "just took me out of my stepdad's car." Sara also told Mellen "that she was upset and that Dad says, quote, 'bad things about my mom.'" She told Mellen that she wanted her to know what was "'really going on'" and "that she actually does not want to go to Dad's anymore." When Mellen asked what

49

changed, Sara said she was afraid of him, and "he is scary and he always carries his gun with him." Sara could not provide a linear narrative when Mellen asked for specifics, but Sara said he pointed the gun at someone but did not know who. When Sara reported these things, Mellen felt she was truthful, a little scared, and reluctant.

Mellen next visited with Sara on July 25, after a week-long summer visit with Father. It was the second consecutive visit where Sara was visibly upset about spending time with Father and told Mellen that she "'feels like she can't be honest with Dad'" and "'I really love him; I just don't want to see him.'" Sara also "reported that she tells her dad that Mom will not let her talk to him, but, quote 'really, I just don't want to talk and I don't want to hurt his feelings[,]'" and "'I lied to him because I don't want him to be mad.'" Sara said Mother was upset about the lie and felt it would cause more problems than being honest with Father. When Mellen asked if Mother allowed Sara to talk to Father on the phone, Sara said, "Yes; I just don't want to." Mellen reminded Sara about the first meeting in which Sara reported a previous counselor lied about things she said about her dad, but Sara denied that the counselor lied and said, "No, she didn't lie about anything." Mellen explained that Sara was "assertive in what" she said, "I just can't be honest with him and I love him[,] . . . and I don't want to hurt his feelings. . . . I just don't want to go there. So, I think she is definitely consistent."

Following the July 25 visit, Mellen included a summary, "After multiple visits with [Sara] over an approximate three-month period, it appears as if the child only recently feels comfortable enough to share her worries and concerns with me. This time progression is also directly correlated to an increase in visits and time spent with [Father]." Mellen testified that the "last two visits when she was visibly upset were correlated to the week-long visits with Dad" and that her anxiety increased the more time she spent with Father. Regarding Sara's report about Father's gun, Mellen explained,

> When [Sara] shared her fears because of the gun [Father] carries, I did not believe that she was in any imminent danger at the time. But I did report that, however, for a child to share a story in which a primary caregiver pointed a gun at someone and expresses fear as a result of that, is disturbing whether or not the incident ever even occurred.

Since she may not communicate with the parties or counsel, Mellen testified that she could not verify that information, but Sara's emotions were consistent with her reports, and she was credible.

Since preparing her report, Mellen had seen Sara twice. She saw Sara on August 8, and she was excited about school orientation. When Mellen asked how things were going at both parents' houses, "she reported that Dad told her it was, quote, 'illegal for her to be left with stepdad because they aren't blood; told her he records her conversations with Mom because he needs to turn it in to the judge

51

because he doesn't trust anyone.'" Mellen said that Father's statement about Stepfather worried Sara.

Mellen's final visit with Sara was on August 15. Sara told Mellen that she had been with her family at the lake and "that at nighttime that she had, quote, 'just started screaming.' And when I asked why, she said that she just wasn't sure. She said that she couldn't stop screaming." Sara said she did not know what happened or why she was "crying and screaming." Mellen said that was consistent with other testimony about Sara's behavior at the lake and Sara was trying to tell her about it.

Mellen testified it was typical that Sara initially seemed happy, relaxed, and reported no issues, then expressed concerns on the fifth visit, since it takes time for kids to trust adults, so Mellen "felt like that was a natural progression[.]" While she agreed it was "possible" Sara could have been coached which impacted how she felt about Father, Mellen did not get the impression from Sara that Mother planting fears and worries caused Sara to experience them as opposed to Father causing them with his behavior. Mellen explained that Sara was most assertive when she shared that she did not want to spend time with Father. Mellen, despite being unable to verify the information Sara provided, noted in her report that "I do not doubt [Sara] experiences internal conflict about [Father]."

## E. Penelope "Polly" Butler's Testimony

Penelope "Polly" Butler also testified. She is an LPC and briefly counseled Sara. Butler first saw Sara in July 2019. Father hired her and said it was because he went through a difficult divorce and was concerned about how Sara was doing with what she was hearing. When she first saw Sara, she was "a regular six-year-old . . . concerned about her parents' divorce[,]" and "wished they would get back together." Butler testified Sara also talked about Stepfather, complained about him a little, which she characterized as "normal issues in that situation." Sara reported that Stepfather "gets mad" and "[h]e screams at me[,]" but Butler did not believe it was anything Father or CPS needed to address.

Butler saw Sara three times, and there "was nothing major that stood out" in the sessions. Butler testified that Sara was comfortable in therapy and seemed open and honest. Butler testified that Sara did not appear coached and was spontaneous during her session. Sara never mentioned being afraid of Father, guns, violence, or danger, and she only mentioned guns related to hunting. Butler did not recall Sara saying anything negative about Father; she talked about them spending time together.

Eventually, Mother called and told her Sara had another therapist, which Butler said was not ideal. Mother told Butler that Sara had been seeing Duckworth, so Butler contacted Duckworth. Butler testified that she concluded her therapeutic

sessions with Sara, because "[s]he was already seeing Ms. Duckworth, and ethically, you really don't need to see two therapists if you're working on the same thing." Butler explained that if she knew Sara was already seeing Duckworth, she would not have seen her and she was unaware that Father brought Sara to her the first time on the same day a modification suit was filed.

## F. Stepfather's Testimony

Stepfather testified that he has two young sons with Mother, and Sara is his stepdaughter. He said he does not feel the need to become Sara's father or ever assume that role and defers to Mother on disciplining Sara. Stepfather testified that they are structured, organized, disciplined, and regimented but fun-loving.

Stepfather testified that Father "has tried to get me to get into an argument or altercation with him on a couple of occasions," and described those incidents, which included Father intentionally walking by and hitting him in the shoulder at Sara's school then putting his hands out as if inviting a fight. Stepfather testified that Father is "very disrespectful" to Mother, and that is "pretty consistent." He said he did not retaliate, because it is not best for Sara, and they are "supposed to be providing the best life for her." Stepfather said that Father shows disrespect to Mother around Sara, but Sara never suggested she was concerned about that.

Stepfather observed that Sara has issues every time she returns from Father's. He described how she behaved, including being "extremely agitated . . . frustrated,

conflicted . . . uncomfortable in her own skin . . . and she'll have these outbursts, just violent . . . I've witnessed her . . . just defiantly not wanting to go." Stepfather described an incident where Sara became so angry with Mother for making her go to Father's that she pushed her two-year-old brother to the ground, which was unlike her. Sara immediately started crying and hugged Mother and said, "Please don't make me go." Mother still makes Sara go. Stepfather explained that Sara has "outbursts where she's just – she's so mad[,]" and he had "never seen anything like it[.]"

He never witnessed Mother badmouth Father in front of Sara and has heard her tell Sara that she loves Father, because she would not have Sara without him. Stepfather testified that Sara's screaming outbursts and uncontrollable crying have increased and occur when she returns from Father's. He saw Sara's anxiety increase as trial approached, and she is constantly preoccupied about when she is going to Father's.

Stepfather was in the room at the lake house when the screaming incident occurred. He described her "violently kicking and screaming in the bed" and "would like arch her back and straighten her legs out and she would pull down on her cheeks[.]" Stepfather testified that Sara begged Mother to help and make it stop. She told Mother she was scared of herself. He had never seen Sara act like that before, and "it was very alarming." Stepfather said it happened twice since the lake house,

55

a few days after they came home and last night. Stepfather said that the night before he testified, Sara was screaming in the shower and asked Mother for a knife, which Stepfather heard from outside the door. Stepfather believes that Sara screaming like that is about Father, because it coincides with her returning from Father's and what she says occurs there. He testified that Sara should not know what goes on in the courtroom, and nobody should tell Sara that Mother is a liar and that she is being brainwashed.

He said that for the eleven months she had no contact with Father, Sara was the "fun-loving, caring" kid "all the time" and had no outbursts; it was the best situation for Sara. That changed when Sara resumed visiting Father unsupervised. Sometimes, it only takes Sara a few hours to lose the attitude and acclimate, and sometimes it takes her a day.

Stepfather disputed Butler's testimony that he screamed at Sara and agreed that not everything Sara told her counselors was true. Despite Harrison's testimony that Sara felt abandoned by Father, Stepfather never saw her exhibit behaviors consistent with that. He believed that Sara needed two healthy co-parents but did not feel that happened with Father, although he did not know what happens in Father's house.

## G. Tricia Sandell's Testimony

Tricia Sandell, a current assistant principal testified. Sandell was Sara's third grade teacher in the 2021–2022 school year and tutored Sara after school. Sandell testified that Sara was a "very sweet little girl . . . a hard worker . . . from a good family[,] [and] [h]er mother takes good care of her . . . she's well-taught. She's well-mannered . . . she's a good student." During the time this description applied to Sara, Father was not allowed visitation or allowed at school. In the spring, when Sara began visiting Father, Sandell noticed changes in her. Early in the school year, Sara was rarely sick, but when she began visiting Father, she started having "tummy aches" at school and "a high level of anxiety." Sandell noticed this occurred when it was time for Father's visitation; when Sara returned on Mondays after being with him, her stomach hurt, she cried and repeatedly said, "I miss my mommy." Sandell let Sara call Mother and listened, then Mother would console her and come to lunch. It happened every time Sara was going to visit Father.

Sandell observed the same things on Mondays after Father's visits and Fridays before those visits. Sara talked to Sandell about her anxiety. Sandell observed her "very upset" and unable to focus on her schoolwork when it was time to visit Father. Sandell testified she was concerned about Sara and her time with Father based on what she witnessed in the classroom.

Sandell knew of the court order on file with the school prohibiting Father from being there, yet Father placed a banner at the school on the first day of classes. It had photos of her and Father in kindergarten and first grade, then blank spaces for second through fourth grades, but the principal removed the banner before Sara saw it. Sandell was unsure why Father placed the banner there but testified it was not normal and made her believe there "are some problems."

## H. Kim Ross's Testimony

Kim Ross, the owner of the dance studio Sara attends, also testified. Sara began classes at their studio when she was three and currently dances there.

Ross observed Sara when Father had visitation and when she had no contact with him, and she said that "there was absolutely a difference[]" in Sara. Ross explained that when Sara had contact with Father, "she was very overwhelmed" and quick to get upset. When Sara did not see Father, she was "perfectly fine," did not have "that almost rage inside of her[,]" and "was doing real well." Ross testified that Sara did not appear scared of Father.

Ross testified that several parents complained about Father videoing students in the studio's hallway, which concerned her. Other parents did not know what he was videoing, and the students were "in their booty shorts and tank tops." Ross testified she was "very upset[]" that Father was videoing and asked him several times to stop, but he continued. Ross testified she eventually confronted Father about it

and had a meeting with him in her office, which Father recorded. This video was admitted into evidence and played for the jury, showing Father behaving obstinately and aggressively.

When Ross told Father that other parents complained about the recording and asked him to stop, he responded that "[h]e was doing it to protect himself." Due to the video issues, Sara stopped attending dance. Ross explained that Mother was not there during Ross's meeting with Father, but when Mother returned, Ross told her it was not good for business and decided "it would be a good time for [Sara] to take a break from dancing." Ross testified that Sara loves to dance and is very talented. Ross said Sara returned after about a year, and she hated to see Sara go, but they knew at the time it was the best thing for all.

Ross described another incident where Father took a five-year-old girl who danced with Sara to a locked bathroom after obtaining the key from the office, even though there were other mothers available to take her. Ross said she discussed this with Father, but he did not agree that was inappropriate. Ross said Father went into the private bathroom with this child. Ross did not know whether the child's parents authorized Father to take her to the bathroom until she talked to her mother, who was very upset about it.

Ross testified that there were issues between Mother and Father where the police were called, and two or three police cars were in her lot. There was another

incident in the lobby with Father and another mom, and she called the police once when Father refused to do something Ross asked him to. Ross did not have similar issues with other families, and she was concerned for her business and reputation.

## I. Dance Mom, "Carrie's" Testimony

The mother of the child Father took to the bathroom at the dance studio, "Carrie," testified. Her daughter is Sara's friend, and she knows her through dance. She explained that they are friends with Mother, and previously, were friends with Father, because he dated one of her best friends. Carrie testified that Sara's father did not have permission to take her daughter to the bathroom, and she "was a little upset about the situation." She said that Father texted her later and apologized, but she told him that in the future, he needed to let another mom take her daughter to the bathroom.

Carrie explained that her daughter had spent the night with Sara at Father's house once when she was four or five for Sara's birthday. She trusted Father then, but "started to lose trust" after the bathroom incident. The night her daughter spent with them, Father sent pictures of the girls playing in the tent and eating dinner, but she learned recently that Father also took pictures of the girls in the bathtub, which surprised and upset her. She explained that her daughter has not been back to Father's house since the birthday because of "some drama," plus she did not think it was appropriate after the bathroom incident.

Carrie testified that she has been on dance trips with Mother and Sara and witnessed Mother give Sara the phone when Father called, but Sara "said she did not want to talk to her dad."

## J. Aunt's Testimony

Mother's sister, "Aunt," also testified. Aunt lives in Groves and sees Mother, Sara, and Stepfather often. She described Mother's household as "loving" and "normal." Her daughters and Sara attend the same dance studio.

Aunt testified that she was at the dance studio the night that Father slapped Mother and witnessed it. Aunt described it as "hit, slap and push her away" over a pair of tap shoes and testified it was aggressive. She knew that Mother complained to the Groves Police Department, but they never contacted her about it. Aunt testified it was untrue if Father said he never laid a hand on Mother. Mother asked Aunt to take Sara home so she would not see Mother speaking with the police. Although it was Mother's night to have Sara, Father refused to let Sara leave with Aunt. Instead, he picked Sara up and walked outside where the police were. When they walked outside, Father was holding Sara, and Aunt saw him slap another woman from the dance studio. Aunt also corroborated the incident where she rode with Mother to get Sara from Father's. Aunt said she stayed in the car, but Father would not turn Sara over until she left, and he accused them of trespassing.

Aunt testified she has been around multiple times when Father called to talk to Sara, Mother tells Sara that he is calling and encouraged her to talk to him. The last three times Aunt observed this, Sara said she did not want to take the call. Aunt testified she was at the lake with Mother's family two weeks ago and heard Sara screaming about midnight. She heard Sara say, "Mommy, I need you. She was, you know, uncontrollably crying, screaming, you know just, Mommy, I need you; Mommy, help me; Mommy, Mommy, Mommy." Aunt heard the yelling for "a good 30, 45 minutes at least." Aunt talked with Mother about Sara screaming, and Mother told Aunt that Sara wanted to kill herself.

**K. Macie Jackson's Testimony**

Macie Jackson, Father's ex-girlfriend, testified they were in a relationship in 2019 for about a year. Jackson is a police officer with the Groves Police Department. Jackson testified that she and Father discussed how he could obtain more visitation. Jackson testified that Father was "obsessed with the situation." She felt that Mother was not a bad parent, but Father was focused on getting more time and turned that focus on Mother. Jackson saw no indication that Mother was a danger to Sara or a bad Mother, but there "definitely is dislike" from Father toward Mother. Father told her that he recorded Mother to "protect himself and that way there was proof and evidence."

Jackson never saw Sara fearful of Father, and they seemed excited to see each other. She had not seen Sara in physical danger. Jackson testified that Father was never violent with her or Sara, she never saw him discipline Sara, and he appropriately consoled Sara. She agreed Father would take control of Sara. Jackson testified that Father's recording devices included a phone and a "fancy pen." Jackson felt that Father was emotionally manipulative in his relationship with her, but Father's interactions with Sara were always positive.

## L. Lee Short's Testimony

Lee Short, Father's employer, also testified. Short rated Father as an "[e]xceptional" employee. He described Father as "a passionate person" who "takes everything to heart." Father told Short that "my daughter has to come first[.]" Short has seen Father with Sara and described him as "a good dad[,]" although he admittedly knew nothing about Father's relationship with Sara or what he says to her when they are alone.

## M. Father's Friends' Testimony

A married couple, who were family friends of Father, testified. They testified that Father was good to Sara, and they never personally witnessed Sara have any outbursts or appear afraid of Father. They also testified that Father and Sara had a loving relationship and that Father behaved appropriately with her.

63

**N. Documentary and Other Evidence**

Many text messages and videos were admitted at trial. Most videos showed Father's interactions with Sara and others. Some videos depicted Father questioning Sara intensely, and Sara crying or appearing fatigued while he did so. A video from June 2022 showed Father violating the trial court's orders including not to record, not to disparage Mother, and not to discuss the litigation. A few videos and photographs admitted at trial showed Sara with her brothers, dancing, and being silly at Mother's home. Documentary evidence admitted at trial also included Mellen's report regarding visitation.

**O. Jury's Verdict**

The jury returned a unanimous verdict that Mother and Father should remain joint managing conservators with Mother retaining the exclusive right to designate Sara's primary residence.

**P. Trial Court's Order and Ruling on Possession, Access, and Duties**

Several days after the jury's conservatorship verdict keeping Mother as the primary custodian, the trial court held a hearing addressing child support, access, and Father's visitation plus rights, duties and powers of the parties. Father represented that the court had all the evidence it needed, so he did not put on more evidence. Father argued he did not want any change from the divorce decree's

expanded standard possession in the divorce decree, other than to terminate the morality clause.

Mother filed a Summary of Relief Requested in Final Order. Father did not dispute Mother's first requested item, which asked the court to adopt the jury's verdict that the parties remain joint managing conservators with Mother having the right to designate Sara's primary residence. As to Mother's second item addressing rights and duties, requesting video visitation only, permanently enjoining Father from contacting school personnel, coaches, healthcare providers, coming onto school premises, attending medical appointments, and other things, Father argued that the trial court cannot rule on those conservatorship issues, because the jury already did that, and the items Mother requested would infringe on the joint managing conservatorship. Regarding the video visitation, Father then said, "we don't disagree that possession and access is well within your province." Father disagreed with having to lock his guns up while Sara was there, because he could not hunt with her. Father argued that Items 2-f through 2-k and 2-v, restrict and enjoin his attendance at extracurricular activities and school along with prohibiting him from interacting with the child's teachers, coaches, healthcare, and mental health providers. Father argued those things described in 2-f through 2-k and 2-v infringe on his rights as a joint managing conservator, and the court did not have the power to do that. As to Item 2-q, Father argued it infringes on his right to free speech,

65

but Father did not specify at the hearing what that provision restricted nor is Item 2-q present in written form in the record. Father also disagreed with Item 2-y, which was the morality clause.

As for rights and duties, Mother argued that the trial court has the power to limit rights and duties based on the evidence, and the custody evaluator recommended most of the things Mother requested.

The trial court noted the parties should get a visitation agreement in writing, and ruled,

> I regret that I'm going to follow all of the Petitioner's summary of requested relief. I regret because I know [Father] loves his daughter tremendously. I don't know how to fix this situation. . . . I will order the visitation set forth in B. That's another reason why I wanted the visitation as agreeable between the parties position. Of course, [Father] can come back to court to advance access and visitation; and that's why I'm going to allow the exchange and so forth language in the decree.

The trial court explained,

> I tell you what scares me. I don't know [Father] and if you appreciate the position or decisions that I have to make regarding children. And all weekend I worried about you and your daughter, and I worried about her threats that she's made.

> And, she from the evidence, does not even want to see you on video. I struggle with that. I don't think that's right. I think that you should have contact with her.

> But I don't want to wake up, read the paper, that a nine-year-old hurt herself. If you – I know you look at me or what have you. There are more young children hurting themselves, committing suicide, because of stress. It doesn't necessarily mean that somebody is bad or you're bad or whatever. But there's stress. That needs to be fixed. And I don't

know how to fix it, other than I'm hoping that this child continues to get some sort of counseling.

I think in the future when you are trying to get back to an ordinary situation, I think that evidence is going to be necessary to show that she is not talking about these things.

. . .

I do believe in all my heart that you love this child and that this child loves you. I'd love to see the pictures of y'all together when she's happy, but apparently right now she's not. And I can't fix that myself.

All I can do is protect and do the best I can to hopefully make all of this work.

This child is young enough that you will have many opportunities, if need be, to come back and do what's necessary to have a good relationship with your daughter.

I know you don't agree. But I felt it necessary to tell you how I felt and why I'm doing what I did.

The trial court held another hearing in October 2022 on Mother's request for attorney's fees. Father objected and argued that there was no question about attorney's fees submitted to the jury and no request to bifurcate, but a question on attorney's fees should have been submitted to the jury. Mother responded that Father failed to object at trial when the court said it would reserve the issue of attorney's fees. The trial court overruled the objection. At the hearing, both of Mother's attorneys testified regarding their hourly rates, tasks, hours billed, and amounts. Father did not object to their testimony or conduct any cross-examination.

On November 21, 2022, the trial court signed the Order in Suit to Modify Parent-Child Relationship. Consistent with the jury's findings, the trial court

appointed parents as joint managing conservators with Mother having the exclusive right to designate Sara's primary residence.

Mother was also given the following exclusive rights: to consent to medical, dental and surgical treatment involving invasive procedures; to receive child support; to make decisions about Sara's education; to enroll Sara in school; to communicate with school personnel; to attend parent-teacher conferences; to communicate with medical and dental personnel providing services to Sara; to schedule medical or dental appointments for Sara; to attend Sara's medical appointments; to consent to psychological and psychiatric treatment of Sara; to select any mental health professionals for Sara; to communicate with persons providing psychiatric or psychological services to Sara; to obtain Sara's medical and psychological records; to make decisions concerning and enroll Sara in extracurricular activities; to communicate with teachers, coaches, or leaders directing Sara's extracurricular activities; to attend Sara's extracurricular activities; to make decisions concerning the Sara's grooming and dress, including the sole right to cut Sara's hair; and to provide Sara with a cell phone and maintain possession of it. The trial court determined that Father had the right to receive information from Mother regarding Sara's health, education, and welfare and to consent to medical, dental, and surgical treatment during an emergency occurring during his possession. The trial court provided that Father, during his possession periods had the: (1) duty

of care, control, protection and reasonable discipline Sara; (2) duty to support Sara, including providing Sara with clothing, food, and shelter; and (3) right to direct Sara's moral and religious training. The trial court ordered that Father "shall have FaceTime (or other video communication) with the child for fifteen minutes on the first, third and fifth Saturdays of every month . . . [and] that [Father] shall not contact the child at any other times, but the child may contact him as she elects." The trial court awarded Mother the right of possession all other times. The trial court determined that Father shall not have in-person possession of Sara unless the conservators agree, and if so, Father must secure all firearms in a locked safe during his possession and shall not video or record the child, Mother, or Stepfather. The trial court imposed a morality clause prohibiting either party from having any person with whom they are not married and have a dating relationship to remain under the same roof as the child between 10 p.m. and 8 a.m. The Order contained a mutual anti-disparagement provision prohibiting the parties from such remarks about one another or their families in the child's presence and a provision prohibiting Father from posting about Mother or her family on social media.

The trial court also permanently enjoined Father from: appearing or coming onto the premises of the child's school; contacting school personnel; attending or appearing at the child's extracurricular activities; contacting teachers, coaches, or leaders of the child's extracurricular activities; contacting the child's healthcare or

69

mental health providers; interrogating, interviewing, or examining the child about Mother, Mother's family, or events in Mother's home; repetitively or excessively contacting Mother for any reason, including asking to speak with the child and may not contact Mother except at 10 a.m. on the first, third, and fifth Saturdays of each month for his video visitation; and discussing the court orders or litigation within the presence, or hearing, of the child.

The trial court awarded Mother attorney's fees in the amount of $81,451.05 for the services of attorney Sonya Coffman, $47,500.00 for the services of attorney Thomas Peterson for a total judgment amount of $128,951.05. The trial court awarded Mother $3,500.00 contingent upon Father filing a motion for new trial which the trial court denies, and $10,500.00 for appellate attorney's fees.

## K. Trial Court's Findings of Fact and Conclusions of Law

Between December 5 and 12, 2022, Father filed four different pro se requests for findings of fact and conclusions of law. On December 27, 2022, and January 12, 2023, Father filed notices of past due findings of fact and conclusions of law. On January 17, 2023, the trial court filed its Findings of Fact and Conclusions of Law.

The trial court's Findings of Fact and Conclusions of Law, included the following, among others:

. . .

8. A jury was impaneled on August 22, 2022 and rendered their verdict on August 26, 2022 denying [Father's] request to be appointed sole

70

managing conservator of the child and his request to be named the conservator who has the exclusive right to designate the primary residence of the child.

9. On August 29, 2022, the trial court pronounced in open court its decision regarding rights and duties, possession and access, permanent injunctions and child support.

. . .

## MATERIAL AND SUBSTANTIAL CHANGE

14. The circumstances of the child, a conservator, or other party affected by the order have materially and substantially changed since the date of the rendition of the prior final order, and it is in the best interest of the child that the prior final order be modified.

## LIMITATIONS ON POSSESSION AND ACCESS

15. Respondent [Father] is a danger to the child's physical or emotional welfare.

16. There is credible evidence that the Standard Possession Order is not in the best interest of the child.

l7. Overwhelming credible evidence established that [Father] subjected the child to significant emotional abuse during his periods of possession of the child[.]

. . .

18. Overwhelming credible evidence established that [Father] subjected the child to significant emotional abuse even while the child was in the possession of the mother[.]

. . .

19. There is credible evidence that [Father] engaged in conduct which the Court considers to be harmful parenting of the child[.]

. . .

20. There is credible evidence that the child sustained emotional harm and physical symptoms resulting from abuse imposed upon the child by [Father] [.]

. . .

21. [Stepfather] testified that the child increasingly demonstrated significant emotional problems after visits with her father and as the trial date approached, she began threatening suicide and even asked for a knife.

22. There is credible evidence that it is not in the best interest of the child for [Father] to have physical possession or unlimited access to the child.

23. There is credible evidence that it is not in the child's best interest for [Father] to have supervised possession or supervised access to the child.

24. There is credible evidence that the imposed restrictions upon [Father's] access to and possession of the child are in the child's best interest.

25. There is credible evidence that the restrictions on [Father's] access to and possession of the child do not exceed those that are required to protect the best interest of the child.

26. There is credible evidence that the restrictions on [Father's] access to and possession of the child are the minimal restrictions necessary to protect the child's best interest.

27. There is credible evidence that the possession of and access to the child awarded to [Father] is in the child's best interest.

. . .

30. There is credible evidence that the child had legitimate worries and anxieties due to [Father's] argumentativeness, verbal aggression toward the mother, loud verbal behavior and the child's observation of firearms in [Father's] possession and control.

. . .

32. There is credible evidence that on numerous occasions [Father] undertook a course of conduct to harass the child's teachers, school administrators, dance instructor, medical providers, and health care and mental health professionals.

33. There is credible evidence that [Father] was intentionally abusive and threatening to significant persons in the child's life, including but not limited to, the mother, the child's dance instructor, the child's stepfather and the child's counselor.

34. There is credible evidence that [Father] undertook a course of conduct to intimidate and instill fear in the child's counselors, including but not limited to, accusing them of aggravated perjury and ethical violations.

35. There is credible evidence that in flagrant disregard of court orders prohibiting recordings, [Father] used multiple recording devices to record all contact and interaction with the child and others[.]

36. The admitted written report of the court-appointed psychological expert, Dr. Kit Harrison, who conducted a custody evaluation indicated, and Dr. Harrison testified, that the child expressed concerns about [Father] recording her mother.

37. There is credible evidence that [Father's] recording practice caused justified anxiety in the child and persons significant to the child.

38. The recordings by [Father] demonstrated his paranoia and narcissistic qualities that were confirmed by psychological testing conducted as part of the court ordered custody evaluation.

39. There is credible evidence that the child expressed to mental health professionals and her mother that she was fearful of her father.

40. The Court's efforts to protect the emotional wellbeing of the child through temporary orders were disregarded by [Father] and credible evidence was presented that [Father] continued to record the child on multiple recording devices and made disparaging remarks about the other parent within the presence or hearing of the child.

. . .

42. According to [Mother, Stepfather, and Aunt] the child has threatened to harm herself following periods of possession by [Father].

43. There is credible evidence that the child thrives emotionally during extended periods when [Father] has not been permitted possession of the child.

44. Psychological testing conducted as part of the court ordered custody evaluation reported that [Father] has purposeful, irresistible urges and personality traits that he is unable to control.

. . .

46. [Father] has disregarded recommendations for mental health treatment and medication necessary for him to be a healthy parent.

. . .

48. [Father] was not a credible witness.

49. There is credible evidence that a standard possession order for [Father] is not in the best interest of the child and the Court's orders at variance with the standard possession order are based on each of the foregoing findings, including but not limited to, [Father's] harmful and abusive conduct towards the child, his harassing conduct toward the child's mother, his disregard for court orders established to protect the child's best interest, his improper contact and interference with the child's teachers, school administrators, dance instructor, medical providers, and health care and mental health professionals and the overall concerns regarding his psychological health.

50. It is not in the best interest of the child for [Father] to have physical possession or unlimited access to the child.

51. It is not in the child's best interest for [Father] to have supervised possession or supervised access to the child.

73

52. The imposed restrictions upon [Father's] access to and possession of the child are in the child's best interest.

53. The restrictions on [Father's access to and possession of the child do not exceed those that are required to protect the best interest of the child.

54. The restrictions on [Father's] access to and possession of the child are the minimal restrictions necessary to protect the child's best interest.

. . .

### *Conclusions of Law -Suit to Modify Parent-Child Relationship*

. . .

11. Since both parents are appointed as conservators, the Court has specified the rights and duties of each parent that are to be exercised by each parent independently or exclusively by [Mother]. (Tex. Fam. Code §153.07l)

12. The best interest of the child is the primary consideration of the Court in determining the issues of conservatorship and possession of and access to the child. (Tex. Fam. Code §153.002)

13. The terms of the Court's modification order denying physical possession of the child to [Father] and imposing restrictions or limitations on [Father's] right to possession of or access to the child are required to protect the best interest of the child. (Tex. Fam. Code §153.193)

14. The Court limits the rights and duties of [Father] in accordance with its findings which support that the limitations are in the best interest of the child. (Tex. Fam. Code § 153.072)

15. The Court recognizes that:

   (a) The guidelines established in the standard possession order are intended to guide the Courts in ordering the terms and conditions for possession of a child by a parent named as a possessory conservator or as the minimum possession for a joint managing conservator.

   (b) It is the policy of this state to encourage frequent contact between a child and each parent for periods of possession that optimize the development of a close and continuing relationship between each parent and child.

   (c) The standard possession order is designed to apply to a child three years of age or older. (Tex. Fam. Code §153.251)

16. The Court recognizes there is a rebuttable presumption that the standard possession order:

(l) provides reasonable minimum possession of a child for a parent named as a possessory conservator or joint managing conservator; and

(2) is in the best interest of the child. (Tex. Fam. Code §153.252)

17. The Court, in ordering that the terms of possession of the child under the order that is other than a standard possession order, was guided by the guidelines established by the standard possession order and considered:

(l) the age, developmental status, circumstances, needs, and best interest of the child;

(2) the circumstances of [Mother and Father]; and

(3) the numerous and significant other relevant factors, including those the Court's Findings of Facts as stated herein. (Tex. Fam. Code §153.256)

18. The terms of the order that deny possession of the child [Father] and that impose restrictions or limitations on [Father's] right to possession of or access to the child do not exceed those that are required to protect the best interest of the child. (Tex. Fam. Code §153.193)

19. Joint managing conservatorship does not require the award of equal or nearly equal periods of physical possession of and access to the child to each of the joint conservators. (Tex. Fam. Code §153.135)

On January 30, 2023, Father filed Counter-Petitioner's Objection to Findings of Fact and Conclusions of Law. Father objects to Findings of Fact 15, 16, 17, 19, 22–27, 30, 35, 40, 42, 43, 49–55, 56, 57, 59–65, 70, 71, 75, 80 and Conclusions of Law 1–9, 11–21, 30–35. He then goes on to generally complain of constitutional violations including his right to free speech under the First Amendment, right to due process under the Fourteenth Amendment, right to bear arms under the Second Amendment, and that the trial court violated his Fourth Amendment rights. However, he does not link any specific finding or conclusion to any particular constitutional violation he generally complains of.

75

**L. Father's Motion for New Trial**

On December 20, 2022, Father also filed a pro se Counter-Petitioner's Motion to Modify, Correct, or Reform Judgment/Motion for New Trial with various exhibits. While generally complaining the injunctions violate his rights under the First, Second, and Fourteenth Amendments, he does not identify any specific provision in the Final Order enjoining his activity. He argues that the trial court "put in place permanent injunctions prohibiting free speech, right to bear arms while with the child, right to record[,]" and that he had to pay attorney's fees.

**III. SAPCR Modifications: Standard of Review and Applicable Law**

Since "the 'trial court is given wide latitude in determining the best interests of a minor child,' we review a modification order under an abuse of discretion standard." *Smith v. Karanja*, 546 S.W.3d 734, 737 (Tex. App.—Houston [1st Dist.] 2018, no pet.) (quoting *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982) (other citation omitted)); *see also Interest of E.C.C.*, 539 S.W.3d 425, 429 (Tex. App.—Beaumont 2018, pet. denied) (explaining that an order modifying conservatorship is reviewed for abuse of discretion). A trial court abuses its discretion if it acted without reference to any guiding rules or principles; in other words, we ask whether the act was arbitrary or unreasonable. *See Worford v. Stamper*, 801 S.W.2d 108, 109 (Tex. 1990) (citation omitted). "A trial court abuses its discretion if it imposes restrictions that exceed those required to protect the child's

best interest." *In re B.O.*, No. 02-16-00485-CV, 2017 WL 2590571, at *30 (Tex. App.—Fort Worth June 15, 2017, no pet.) (mem. op.) (citing *In re H.D.C.*, 474 S.W.3d 758, 764 (Tex. App.—Houston [14th Dist.] 2014, no pet.)) (noting same in context of DFPS being appointed child's permanent managing conservator). To determine whether a trial court abused its discretion in modifying a parent's possession, we examine whether the trial court had sufficient information on which to exercise its discretion, and, if so, whether it acted reasonably in applying its discretion based on the information before it. *See Resendiz v. Martinez*, No. 13-22-00060-CV, 2023 WL 4782675, at *2 (Tex. App.—Corpus Christi-Edinburg July 27, 2023, no pet.) (mem. op.); *Townsend v. Vasquez*, 569 S.W.3d 796, 807 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). Under an abuse of discretion standard as applied to the modification of a custody order, legal and factual sufficiency are not independent grounds of review but are relevant factors in determining whether the trial court abused its discretion. *In re K.E.L.*, No. 09-08-00014-CV, 2008 WL 5671873, at *1–2 (Tex. App.—Beaumont Feb. 26, 2009, no pet.) (mem. op.) (quoting *In re T.D.C.*, 91 S.W.3d 865, 872 (Tex. App.—Fort Worth 2002, pet. denied)). A trial court does not abuse its discretion if some evidence of a substantive and probative character supports the trial court's decision. *Id.* Generally, a trial court does not abuse its discretion when the trial court bases its decision on conflicting evidence. *See In re B.C.C.*, No. 09-21-00001-CV, 2022 WL 17350920, at *9 (Tex.

77

App.—Beaumont Dec. 1, 2022, no pet.) (mem. op.); *In re K.R.P.*, 80 S.W.3d 669, 674 (Tex. App.—Houston [1st Dist.] 2002, pet. denied).

"The best interest of the child shall always be the primary consideration of the court in determining issues of conservatorship and possession of and access to the child." Tex. Fam. Code Ann. § 153.002; *In re J.J.R.S.*, 627 S.W.3d 211, 218 (Tex. 2021) (citation omitted). To determine the child's best interest, courts consider a non-exhaustive list of factors. *See Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). These factors include the desires of the child, the emotional and physical needs of the child now and in the future, the emotional and physical danger to the child now and in the future, the parental abilities of the individuals seeking custody, the programs available to assist these individuals to promote the best interest of the child, the plans for the child, the stability of the home, the acts or omissions of the parent that may suggest that the existing parent-child relationship is not a proper one, and any excuse for the acts or omissions of the parent. *Id.* In a modification proceeding, other factors courts consider include the child's need for stability and the need to prevent constant litigation. *In re V.L.K.*, 24 S.W.3d 338, 343 (Tex. 2000).

"[C]onservatorship determinations are 'intensely fact driven.'" *J.J.R.S.*, 627 S.W.3d at 218 (quoting *Lenz v. Lenz*, 79 S.W.3d 10, 19 (Tex. 2002)). Therefore, "the trial court is in the best position to 'observe the demeanor and personalities of the witnesses and can "feel" the forces, powers, and influences that cannot be discerned

by merely reading the record.'" *Id.* (quoting *Echols v. Olivarez*, 85 S.W.3d 475, 477 (Tex. App.—Austin 2002, no pet.)). "A trial court's determination of what is in the child's best interest, specifically the establishment of terms and conditions of conservatorship, is a discretionary function." *Id.* (citation omitted).

When the trial court enters findings of fact and conclusions of law, we review the trial court's findings of fact for sufficiency of the evidence, and the trial court's conclusions of law are reviewed de novo. *See Hegar v. Am. Multi-Cinema, Inc.*, 605 S.W.3d 35, 40 (Tex. 2020); *In re A.E.*, No. 09-16-00019-CV, 2017 WL 1535101, at *5 (Tex. App.—Beaumont Apr. 27, 2017, pet. denied) (mem. op.) (citation omitted) (discussing same in context of standing). Appellate courts defer to the trial court's findings of fact, if they are supported by the record. *See Sw. Elec. Power Co. v. Lynch*, 595 S.W.3d 678, 683 (Tex. 2020). "In determining whether there is legally sufficient evidence to support the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not." *In re A.E.A.*, 406 S.W.3d 404, 414 (Tex. App.—Fort Worth 2013, no pet.) (citing *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005)). "Anything more than a scintilla of evidence is legally sufficient to support the finding." *Id.* (citations omitted).

Father challenges sixty-seven of the trial court's findings of fact and eleven conclusions of law, which are generally the same for each issue.[5]

## IV. Analysis

### A. Issue One: Periods of Possession

In his first issue, Father contends that the trial court abused its discretion when it did not order specific periods of possession between him and Sara when "extreme circumstances" were not present here. In support of this issue, Father also contends there is a presumption the standard possession order is in the child's best interest, the trial court's order was an "as agreed" possession order and "is tantamount to a complete denial of possession" which the facts are insufficient to support, and since he is a joint managing conservator, the trial court abused its discretion in denying him possession.[6]

---

[5] For this issue and all subsequent issues, we focus on the challenged findings and conclusions that globally support the trial court's Order, such as best interest, good cause, and least restrictive means, since if supported by the record, they are grounds to affirm the trial court's Order. For purposes of brevity, we do not address the challenged more granular factual findings, which support those broader findings, as those granular findings would not be grounds to reverse the trial court's Order. *See* Tex. R. App. P. 47.1 (requiring the appellate court to "hand down a written opinion as brief as practicable but that addresses every issue raised and necessary to final disposition of the appeal[]").

[6] Our sister court in Houston recently addressed a case where a parent's access to their children was permanently restricted under a lifetime protective order involving family violence. *See Stary v. Ethridge*, 695 S.W.3d 417, 425–28 (Tex. App.—Houston [1st Dist.] 2022, pet. granted). There, the parent argued the lifetime protective order was tantamount to a termination and due process demanded a clear

"Joint managing conservatorship does not require the award of equal or nearly equal periods of physical possession of and access to the child to each of the joint conservators." Tex. Fam. Code Ann. § 153.135. There is a rebuttable presumption that a standard possession order is in the child's best interest and provides the minimum amount of time for possession of a child for a joint managing conservator. *See id.* § 153.251. The Supreme Court of Texas explained in *J.J.R.S.* that an "as agreed" visitation order is one that does not specify periods of possession but gives the managing conservator complete discretion over another's possession. *See J.J.R.S.*, 627 S.W.3d at 219 (discussing same in a parental rights termination case). That case explained that an "as agreed" visitation order was "not an outright denial that forecloses all access[,]" rather it restricted and limited access in that case. *Id.* at 220. The Court held "that Texas Family Code sections 153.006(c) and 153.193, read in conjunction, permit" an "as agreed" visitation order "in the narrow circumstance

_____

and convincing standard applied rather than a preponderance of the evidence. *See id.* The present case is distinguishable in that the lifetime protective? order was entered after a trial on the merits. Also, in a protective order involving family violence, a party is limited to two motions for review by the trial court, whereas in a modification like this, a trial court's review of its prior order is not limited; upon a parent's petition, if a trial court finds it is in the child's best interest and there has been a material change in circumstance for any of the parties or the child, a trial court may modify its prior order. *Compare* Tex. Fam. Code Ann. § 85.025(b-2), *with* Tex. Fam. Code Ann. § 156.101(a). Finally, as we explain in our Analysis, *infra*, although the restrictions were severe, this order did not deny Father all access to the child.

where such a severe restriction is necessary to protect the child's best interest." *Id.* at 221.

Contrary to Father's assertion, the trial court's order in this case did not completely deny Father possession or access to Sara. *See id.* at 219–20. While we agree the restrictions limit Father's access and possession, the order allowed Father to have video visitation with Sara three times per month on specific days and times. The trial court allowed for the possibility that Father could expand his possession and access as "mutually agreed to, in writing, and in advance, by the parties, and in the absence of mutual agreement," the video visitation times set forth in the order applied.

In support of his argument that "extreme circumstances" were not present here, Father cites *Resendiz v. Martinez. See* 2023 WL 4782675, at *4–5. He urges us to follow our sister court's example and conclude the evidence was insufficient to rebut the presumption a standard possession order was in the child's best interests. *See id.* Father asserts that Sara behaved like those children, including showing "bad attitudes" and "aggression" toward their mother. *See id.* at *3–4. Although Sara exhibited some of the same behaviors as the children in *Resendiz*, the evidence here differs in key respects. First, there was no evidence the children in *Resendiz* were suicidal or afraid of their father. *See id.* Second, the mother's brief testimony in that case was the only evidence of how visiting their father negatively impacted the

children. *See id.* Whereas here, multiple witnesses testified about the negative impacts of Father's behavior on Sara including Mother, a custody evaluator, custody monitor, teachers, dance instructors, and other family members. Each of these witnesses delineated examples of Father's poor behavior and how it impacted Sara. Third, unlike the case before us, nothing in *Resendiz* indicates that the father persisted in violating orders the trial court put in place to protect the child. *See id.* Fourth, in *Resendiz* there was no evidence the father suffered from impulse control issues that detrimentally impacted the children or that he failed to follow recommendations to obtain psychiatric treatment to address those issues. Finally, that case involved an initial divorce decree entered while the father was in prison. *See id.* at *1.

Here, the trial court's findings included that Father posed "a danger to the child's physical or emotional welfare[,]" and there was "credible evidence that the Standard Possession Order is not in the best interest of the child." The record supports these findings. *See Lynch*, 595 S.W.3d at 683. Testimony from multiple witnesses established "that the child increasingly demonstrated significant emotional problems after visits with her father and as the trial date approached, she began threatening suicide and even asked for a knife[,]" credible evidence established "that it is not in the best interest of the child for [Father] to have physical possession or unlimited access to the child[,]" and "that it is not in the child's best

interest for [Father] to have supervised possession or supervised access to the child." Also relevant, the trial court found that "the restrictions on [Father's] access to and possession of the child do not exceed those that are required to protect the best interest of the child[]" and "that the restrictions on [Father's] access to and possession of the child are the minimal restrictions necessary to protect the child's best interest."

The record shows that the trial court attempted through various temporary orders to address Father's problematic interactions with the child and others in her life by first reducing his visitation, then eliminating it altogether when he continued to disparage Mother to the child, the child had worsening outbursts, begged her Mother not to let him take her, and refused to see a counselor unless she, Mother, and the counselor were all disguised. Based on the custody evaluation, the trial court tried to resume Sara's visits with Father in the months leading up to trial.

Multiple witnesses testified that Sara's behavior and emotional state improved when she stopped having contact with Father, but her emotional condition deteriorated significantly once Father's visits resumed, and the increase in her anxiety and expressed fears of him increased as she spent more time with him. Harrison recommended that Father's visits resume "with the strings attached" in his report, including "a whole list of conditions like him getting treatment, monitoring the situation." Yet, the evidence shows that Father did not follow the conditions

Harrison set forth, like obtaining psychiatric treatment and medication to help deal with his impulse control issues and verbal aggression. The record also establishes that despite being given ample opportunity, Father persisted in violating the trial court's orders by recording Sara, speaking negatively about Mother to her, and discussing the court proceedings with her, and that these behaviors negatively impacted the child. The custody monitor explained in her report how the child's increased anxiety corresponded to her increased visits with Father. Other witnesses testified that in the weeks leading up to the trial, Sara did not want to see Father or speak with him, had at least two "meltdowns" where she expressed a desire to kill herself, and even asked for a weapon.

Since the trial court's order specified designated periods for Father to have video visitation with the child, we disagree that this order constituted an "as agreed" order but we agree that the restrictions were severe. Based on the evidence, including Sara's deteriorating emotional state as Father's visitation increased, expressed desire to harm herself, expressed fear of Father, and desire not to see him, we conclude that this case presents "extreme circumstances warranting a severe restriction" on Father's possession and access. *See J.J.R.S.*, 627 S.W.3d at 221. Additionally, Father's refusal to follow Harrison's recommendations to help improve his parenting coupled with his continued violation of the trial court's orders to the child's detriment support the severe restrictions in this case. *See id.*

85

Father's argument that since he was appointed a joint managing conservator, the trial court abused its discretion by denying him possession and that such a finding necessarily implies he would not endanger the child's emotional or physical welfare lacks merit. First, the trial court made express findings that are supported by evidence that Father was a danger to Sara, which is contrary to the finding which Father advocates. Second, as we have explained, this was not an "as agreed" order and even if it was, such an order did not completely deny Father access. *See id.* at 222 (noting that the "as agreed" order at issue in that case "was not a denial of access[]"). Third, relying on the label "joint managing conservator" as something that precludes severe restrictions on the conservator's possession and access in the face of harm to the child, the child's fragile mental state, the parent's persistent violation of court orders and refusal to seek psychiatric treatment to improve his compulsive behaviors that were harmful to his relationships, puts form over function. "Joint managing conservatorship does not require the award of equal or nearly equal periods of physical possession of and access to the child to each of the joint conservators." Tex. Fam. Code Ann. § 153.135. The trial court's primary concern shall always be the best interest of the child when determining issues of conservatorship and possession and access to the child. *See id.* § 153.002. Here, the trial court has seemingly balanced protecting this child's best interest with Father's rights by allowing him to remain a joint managing conservator and the opportunity

86

for him to improve the relationship with his daughter. *See id*. § 153.001(a) (outlining public policy including encouraging frequent contact with parents and having parents share rights and duties); *see also J.J.R.S.*, 627 S.W.3d at 222 (rejecting similar argument and explaining "[s]uch a proposition is antithetical to the purpose of visitation orders, which strive to balance the rights of parents with the importance of protecting the children[]").

We overrule Father's first issue.

## B. Issue Two: Securing Firearms

In issue two, Father complains that the trial court abused its discretion when it ordered him to secure all firearms in a locked gun safe during his possession of the child.[7] In support of this issue, he also claims the trial court's order infringes on his constitutional rights under the Second Amendment of the United States Constitution and Article I, Section 23 of the Texas Constitution. He also contends that rather than an abuse of discretion standard, strict scrutiny applies. He notes that a child's best

---

[7]He does not argue that section 153.002 of the Family Code instructing that the trial court's primary consideration is the best interest of the child is facially unconstitutional or unconstitutional as applied to him. *See* Tex. Fam. Code Ann. § 153.002. Likewise, his docketing statement indicates he is not challenging the constitutionality of the statute. Absent such a challenge to the constitutionality of the statute, we conclude any complaint concerning the trial court's order placing restrictions on Father during periods of physical possession for the best interest of the child are to be reviewed for an abuse of discretion. *See id.*; *In re J.J.R.S.*, 627 S.W.3d 211, 218 (Tex. 2021) (explaining that trial court's primary concern shall always be best interest and setting terms and conditions of conservatorship is a discretionary function).

interest "can trump other constitutional rights," but in this case the evidence was insufficient for the restriction.

As we have already explained, legal and factual sufficiency are not separate grounds for review as applied to the modification of a custody order but are relevant factors in determining whether the trial court abused its discretion. *See In re K.E.L.*, 2008 WL 5671873, at *1–2 (citation omitted); *In re T.D.C.*, 91 S.W.3d at 872. A trial court does not abuse its discretion if some evidence of a substantive and probative character supports the trial court's decision. *In re K.E.L.*, 2008 WL 5671873, at *1–2 (citation omitted). Generally, a trial court does not abuse its discretion when it bases its decision on conflicting evidence. *See In re K.R.P.*, 80 S.W.3d at 674. "The court may limit the rights and duties of a parent appointed as a conservator if the court makes a written finding that the limitation is in the best interest of the child." Tex. Fam. Code Ann. § 153.072; *see also id*. § 153.002. Even so, "[t]he terms of an order that . . . imposes restrictions or limitations on a parent's right to possession of or access to a child may not exceed those that are required to protect the best interest of the child." *Id.* § 153.193.

Although Father disagreed that Sara wanted to harm herself because of Father's distrust of Mother and Sara's counselors, there was "evidence of a substantive and probative character" supporting the trial court's decision to require Father to secure his firearms in a safe when he has physical possession of Sara for

her best interest. *See In re K.E.L.*, 2008 WL 5671873, at *1–2; *In re K.R.P.*, 80 S.W.3d at 674; *see also* Tex. Fam. Code Ann. § 153.002. Photographs admitted at trial showed a semiautomatic weapon unsecured in Father's vehicle, and while Father testified he no longer keeps the gun in his vehicle that way, he had done so previously. Additionally, evidence showed that Sara repeatedly mentioned guns to counselors and Mellen, the court-appointed visitation monitor. Mellen testified Sara reported that Father "was scary and always carries his gun with him," and reported that he pointed a gun at someone. Mellen explained that Sara reporting the incident was disturbing whether or not it happened. Finally and importantly, as discussed above, multiple witnesses testified Sara expressed a desire to kill herself, and in one instance asked for a weapon.

The trial court did not abuse its discretion by including a provision in its order requiring Father to secure his firearms in a locked safe during his periods of possession, because "some evidence of a substantive and probative character" supported that it was in Sara's best interest. *See In re K.E.L.*, 2008 WL 5671873, at *1–2; *see also* Tex. Fam. Code Ann. § 153.002. The trial court made the requisite findings that its restrictions were in the child's best interest and that did not exceed those required to protect the child's best interest. *See* Tex. Fam. Code Ann. §§ 153.072, 153.193. The trial court could have reasonably concluded that given Sara's mental state and Father's history of leaving a firearm unsecured in his vehicle, that

89

requiring Father to secure his firearms while he had possession of Sara did not exceed what was necessary to protect her best interest. *See id*.

Further, as to his constitutional argument, even if strict scrutiny applies to the trial court's restriction requiring Father to secure his firearms in a safe, he only had to do so while he had the child in his possession. Based on the evidence adduced in this case, we conclude the trial court narrowly tailored the restriction to a compelling government interest to protect this particular child who had expressed a desire to harm herself. *See Schlittler v. State*, 488 S.W.3d 306, 313 (Tex. Crim. App. 2016) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)) (explaining that under strict scrutiny a reviewing court assesses whether the infringement is narrowly tailored to serve a compelling government interest).

We overrule issue two.

## C. Issue Three: Video Recordings and Social Media

In his third issue, Father complains that the trial court prohibited him from (1) recording the child and others and (2) posting about Mother or her family on social media. Specifically, he contends the trial court abused its discretion when it issued a permanent injunction with insufficient evidence. In support of this issue, he also claims the trial court's permanent injunction against recording and posting online impermissibly restricts his First Amendment rights and violates his due process rights by preventing him from collecting evidence to make his case.

We turn now to Father's contention that the trial court abused its discretion. A trial court may issue a permanent injunction when it is in the children's best interest. *See, e.g., Steenrod v. Pidgeon*, No. 03-22-00659-CV, 2024 WL 3528672, at *5 (Tex. App.—Austin July 25, 2024, no pet.) (mem. op.); *Gerges v. Gerges*, 601 S.W.3d 46, 61 (Tex. App.—El Paso 2020, no pet.); *King v. Lyons*, 457 S.W.3d 122, 126 (Tex. App.—Houston [1st Dist.] 2014, no pet.); *Peck v. Peck*, 172 S.W.3d 26, 35 (Tex. App.—Dallas 2005, pet. denied). We review a trial court's decision regarding the imposition of a permanent injunction for the best interest of the child for an abuse of discretion. *See Steenrod*, 2024 WL 3528672, at *5; *Gerges*, 601 S.W.3d at 61.

As we have already described in the background and our analysis of issues one and two, evidence admitted at trial showed that Father persisted in recording Sara despite (1) the child's expressed discomfort with Father recording her and others, (2) Father's recording and poor behavior surrounding it resulted in her having to quit dance, an activity she loved, and (3) the trial court's orders prohibiting it. From all this evidence, the trial court could have reasonably concluded that a permanent injunction was necessary given Father's ongoing recording of Sara and others in her life in violation of court orders and that it was harmful.

The trial court entered the following express findings relevant to recording:

35. There is credible evidence that in flagrant disregard of court orders prohibiting recordings, [Father] used multiple recording devices to

91

record all contact and interaction with the child and others, including but not limited to:

    a. the child['s] teacher[]s;

    b. the child's coaches;

    c. medical and mental health professionals; and

    d. conversations between the mother and the child.

36. The admitted written report of the court-appointed psychological expert, Dr. Kit Harrison, who conducted a custody evaluation indicated, and Dr. Harrison testified, that the child expressed concerns about her father [] recording her mother.

37. There is credible evidence that [Father's] recording practices caused justified anxiety in the child and persons significant to the child.

. . .

40. The Court's efforts to protect the emotional wellbeing of the child through temporary orders were disregarded by [Father] and credible evidence was presented that [Father] continued to record the child on multiple recording devices and made disparaging remarks about the other parent within the presence or hearing of the child.

The trial court also found that Father engaged in harmful parenting when he recorded the child while discussing court proceedings.

Additional findings made by the trial court included that Sara complained that Father says bad things about Mother, that he hates Stepfather, and records conversations between her and Mother which she does not want him to do. The record supports these findings, including testimony from Harrison, Ross, Mother, and Father's ex-girlfriend as well as recordings Father made in violation of the trial court's temporary orders. Accordingly, we conclude there was sufficient evidence to support the trial court's findings. *See Lynch*, 595 S.W.3d at 683; *In re A.E.A.*, 406 S.W.3d at 414.

Again, "some evidence of a substantive and probative character" supported the trial court's prohibition on Father's recording. *See In re K.E.L.*, 2008 WL 5671873, at *1–2; *see also* Tex. Fam. Code Ann. § 153.002. The trial court found that the orders limiting his rights and duties as a joint managing conservator were necessary "to protect the wellbeing and best interest of the child[]" and were "minimally restrictive as necessary to protect the wellbeing and best interest of the child." *See* Tex. Fam. Code Ann. §§ 153.002, 153.072, 153.193. As for the permanent injunctions, the trial court also found that they were "to protect the child from further emotional and physical danger now and in the future and are in the best interest of the child[,]" that "there is no adequate remedy at law and because the permanent injunctions are in the best interest of the child[,]" and that they "are appropriate because they relate to custody, control, or visitation." The trial court added that it considered Harrison's recommendations when enjoining Father's conduct. Thus, we conclude the trial court did not abuse its discretion in issuing the complained-of injunctions and orders restricting Father's ability to record.

His constitutional complaints about the recording prohibition lack merit. There is no constitutional right to record others. Further, his ability to put on a case would not be impeded by an absence of recordings, since he can offer other forms of evidence, including testimony from witnesses.

93

The second provision Father complains of in this issue states that "[Father] shall not post about [Mother], or her family, on any form of social media." To preserve a complaint for appellate review, a party must present the trial court with a timely request, motion or objection, state the grounds with "sufficient specificity to make the trial court aware of the complaint," and obtain an adverse ruling. *See* Tex. R. App. P. 33.1(a). "Even constitutional claims must be preserved for appellate review." *In re S.V.*, 599 S.W.3d 25, 40 (Tex. App.—Dallas 2017, pet. denied) (citing *In re L.M.I.*, 119 S.W.3d 707, 710–11 (Tex. 2003); *Dreyer v. Greene*, 871 S.W.2d 697, 698 (Tex. 1993)).

The record reflects that after they jury's verdict, the trial court held a hearing on rights, duties, possession, and access which covered Mother's Summary of Requested Relief. During that hearing, Father complained that item "q" infringed on his "free speech rights" but never specified what item "q" said nor is there anything contained in the record that would show item "q" concerned social media postings. Likewise, in Counter-Petitioner's Motion to Modify, Correct, or Reform Judgment/Motion for New Trial, Father generally complains about the violation of his First Amendment rights, but he does not identify the restriction on social media posting as being objectionable. Further, although one of the exhibits with the motion was Mother's Summary of Requested Relief, it was filed missing several pages and it does not contain item "q." Thus, there is nothing in the record to show that Father

94

objected in the trial court to the social media restriction on the grounds that it violated his First Amendment rights. *See* Tex. R. App. P. 33.1(a). Father has failed to preserve this argument for our review. *See id.*; *S.V.*, 599 S.W.3d at 40.

We overrule issue three.

## D. Issue Four: Permanent Injunctions and Order Restricting Access

In issue four, Father argues that the trial court abused its discretion by granting "unnecessary and unreasonable permanent injunctions prohibiting" him "from interacting with his child." Father again argues that some of the provisions violate his First Amendment rights as they constitute a prior restraint under article I, section 8 of the Texas Constitution. He complains of the following specific orders and injunctions:

1. [Father] shall not appear at the child's school, nor shall he come onto the premises of the child's school, at any time or for any reason.
2. [Father] shall have no contact with personnel of the child's school.
3. [Father] shall not attend, nor appear at, the child's extracurricular activities.
4. [Father] shall have no contact with teachers, coaches, or leaders of the child's extracurricular activities.
5. [Father] shall have no contact with the child's healthcare or mental health care providers.
7. [Father] (or anyone acting in concert with him) shall not interrogate, interview, or examine the child about [Mother] or [Mother's] family, or events at [Mother's] home.
. . .
10. [Father] shall not repetitively or excessively contact [Mother] for any reason, including asking to speak with the child. [Father] shall not contact [Mother] at any times other than 10:00 a.m. on the first, third and fifth Saturdays of each month for his video visitation with the child, except in the event of an emergency.

95

. . .

IT IS ORDERED that [Father] is permanently enjoined from:

1. Personal meetings or contact with personnel of the child's school.

2. Personal meetings or contact with the child's healthcare or mental health care providers.

3. Personal meetings or contact with teachers, leaders, or coaches of the child's extracurricular activities.

8. Coming onto the premises of the child's school, extracurricular activities, health appointments, dental appointments, or mental health appointments.

9. Attending the child's extracurricular activities.

10. Interrogating, interviewing, or examining the child about the other parent or the other parent's family.

. . .

(f) Mutual No Discussion of Litigation Provision---

IT IS ORDERED that neither conservator shall discuss (or allow anyone else to discuss) the court orders or litigation within the presence, or hearing, of the child.

We address Father's challenges to these orders restricting his possession and access and to what he describes as a "permanent injunction" under the same abuse of discretion standard we have outlined in issues one through four, *supra*. We have detailed elsewhere in the opinion that the trial court entered the requisite findings that the restrictions imposed were in the child's best interest and did not exceed those required to protect the child's best interest. *See* Tex. Fam. Code Ann. §§ 153.002, 153.072, 153.193. We have also outlined in the background discussion and our analysis of issues one through four, *supra*, the evidence that supports these findings. Harrison recommended that Father be allowed visitation "with the strings attached in his report." Harrison opined in his custody evaluation that Father:

should be enjoined from personal contact with health care or mental health providers[,] . . . should be enjoined from taking the child to a health care provider or facility unless it involves an immediate danger or emergency to the physical health and safety of the child, . . . should be enjoined from personal meetings with school personnel until further order from the Court.

Additional noteworthy evidence included testimony about Father's poor behavior at the dance studio and recorded evidence of Father interrogating the child while she was crying about things that happened in Mother's home.

Again, this is "some evidence of a substantive and probative character" supporting that these permanent injunctions were in Sara's best interest. *See In re K.E.L.*, 2008 WL 5671873, at *1–2; *see also* Tex. Fam. Code Ann. § 153.002. The trial court made the requisite findings that its orders limiting Father's rights and duties were in the child's best interest and did not exceed those required to protect the child's best interest. *See* Tex. Fam. Code Ann. §§ 153.002, 153.072, 153.193.

Father also contends that the injunctions constitute a prior restraint on his right to free speech under Texas Constitution, article I, section 8. As we explained in issue four, to preserve a complaint for appellate review, a party must make a timely request, motion or objection in the trial court and state the grounds with "sufficient specificity to make the trial court aware of the complaint," and obtain an adverse ruling. *See* Tex. R. App. P. 33.1(a). Error preservation rules apply to constitutional claims. *In re S.V.*, 599 S.W.3d at 40. Father's Motion to Modify, Correct, or Reform the Judgment/Motion for New Trial does not complain of any specific provisions in

the trial court's order. In his later filed Objections to Findings of Fact and Conclusions of Law, Father noted thirty-five different findings and twenty-three separate conclusions of law that he complains violated the constitution. He then argues that the findings of fact and conclusions of law generally amounted to an impermissible prior restraint in violation of the First Amendment, as well as violated his Second Amendment right, Fourth Amendment, and due process rights. Nevertheless, he failed to specify which findings or conclusions violated which constitutional rights. Likewise, in his Motion for New Trial, Father identified no particular provision that constituted a prior restraint. *See id.* We note that the trial court's order spanned thirty-six pages, and without identifying the provisions in the order constituting a prior restraint, he failed to present his complaint to the trial court with "sufficient specificity." *See* Tex. R. App. P. 33.1(a). Therefore, father has failed to preserve this argument for our review. *See id.*; *S.V.*, 599 S.W.3d at 40.

We overrule issue four.

## E. Issue Five: Morality Clause

Father complains in his fifth issue that the trial court abused its discretion when it ordered a permanent injunction preventing non-married romantic interests from staying the night when the child is present. We disagree.

"The trial court has broad discretion in fashioning restrictions on a parent's possession and access that are in the best interest of the children, including

forbidding unrelated people from living or staying overnight at the parent's home during visitation." *Moreno v. Perez*, 363 S.W.3d 725, 739 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *see also Peck,* 172 S.W.3d at 32–33 (affirming order enjoining both parties, while in possession of child, from permitting persons with whom they have or might have intimate or dating relationship from remaining overnight in same residence or lodging).

Father testified that his current girlfriend and her children stay in his home occasionally. Evidence also showed that Father had asked that Mother release him from the morality clause in connection with a prior girlfriend claiming they "built a foundation that will be solid for many years to come." Yet, the next day, he called the police to conduct a civil standby as that girlfriend moved out. This is coupled with ample evidence outlined that Father struggled with impulse control and verbal aggression, for which he refused to get help. Further, evidence showed that Sara suffered from an "adjustment disorder."

In determining such a clause was in Sara's best interest, the trial court could have considered her need for stability, her emotional state, and Father's actions. *See Holley*, 544 S.W.2d at 371–72. Based on this evidence of Father's romantic relationships, including overnight guests, the necessity of civil standbys with an ex-girlfriend, Father's impulse control issues, verbal aggression, and Sara's adjustment disorder, the trial court could reasonably conclude that the mutual morality clause

99

prohibiting parents from having individuals with whom they have a dating or romantic relationship with and to whom they are not married from staying under the same roof as the child between the hours of 10 p.m. and 8 a.m. was in Sara's best interest. *See Moreno*, 363 S.W.3d at 739; *see also Peck*, 172 S.W.3d at 32–33. Since "some evidence of a substantive and probative character" supported that a morality clause was in Sara's best interest, the trial court did not abuse its discretion. *See In re K.E.L.*, 2008 WL 5671873, at *1–2; *see also* Tex. Fam. Code Ann. § 153.002.

We overrule issue five.

## F. Issue Six: Exclusive Right to Make Decisions

In issue six, Father contends the trial court abused its discretion when it gave Mother the exclusive right to make all decisions concerning the child. As outlined in our discussion of issues one through five, *supra*, the trial court found that the orders, limitations, and restrictions on Father's rights and duties were in Sara's best interest. This is consistent with the Legislature's instruction in the statute that the trial court's primary consideration shall always be the best interest of the child. *See* Tex. Fam. Code Ann. § 153.002. The evidence we have previously discussed supports the trial court's findings that giving these rights exclusively to Mother and restricting Father's rights was in Sara's best interest, so we defer to them. *See Lynch*, 595 S.W.3d at 683; *In re A.E.A.*, 406 S.W.3d at 414; *In re K.E.L.*, 2008 WL 5671873, at *1–2; *see also* Tex. Fam. Code Ann. § 153.002.

The exclusive rights the trial court awarded Mother follow Harrison's recommendations and supported by the evidence of Father's harmful parenting, tic-like behavior, dismissive attitude about Sara's emotions, and past interference with Sara's activities and medical care even during Mother's periods of possession. That evidence combined with Father's continued violation of court orders and failure to follow the custody evaluator's conditions support the trial court awarding these rights exclusively to Mother. We conclude the trial court did not abuse its discretion by awarding the exclusive rights to make decisions about Sara to Mother and that doing so was in Sara's best interest. We overrule issue six.

## G. Issues Seven and Eight: Attorney's Fees

In issue seven, Father complains the trial court abused its by awarding attorney's fees to Mother and conditioned a judgment for Mother if she filed an appellate brief. He argues that Mother did not provide billing invoices. Here, the trial court awarded Mother attorney's fees of $81,451.05 for "reasonable and necessary attorney's fees and expenses incurred for the services of her attorney Sonya B. Coffman," and $47,500 for "reasonable and necessary attorney's fees incurred for the services of her attorney Thomas A. Peterson," for a total award of $128,951.05. The trial court also awarded Mother contingent fees of $3,500 if Father filed a motion for new trial that was denied and $10,500 if Father unsuccessfully pursued an appeal that required Mother to file an appellate brief. The trial court issued

findings of fact on the attorney's fees and that the fees awarded were reasonable and necessary. Father does not challenge these findings of fact on appeal.

In SAPCRs, the Family Code provides a "comprehensive scheme" awarding fees pursuant to a general statute and specific statutes. *Tucker v. Thomas*, 419 S.W.3d 292, 295 (Tex. 2013). Section 106.002 applies to all SAPCRs and allows the trial court broad discretion to render judgment for reasonable attorney's fees. Tex. Fam. Code Ann. § 106.002 ("In a suit under this title, the court may render judgment for reasonable attorney's fees and expenses[.]"); *Bruni v. Bruni*, 924 S.W.2d 366, 368 (Tex. 1996) (discussing the broad discretion granted to trial courts in awarding attorney's fees in SAPCRs); *see also Lenz*, 79 S.W.3d at 21 (explaining award of attorney's fees in a SAPCR is discretionary); *In re M.A.N.M.*, 231 S.W.3d 562, 567 (Tex. App.—Dallas 2007, no pet.) (explaining the trial court has "broad discretion" in deciding an attorney's fees award under section 106.002).

"[A]n award of attorney's fees must be supported by evidence that the fees are reasonable and necessary." *In re K.A.M.S.*, 583 S.W.3d 335, 349 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (citations omitted).

> Generally, contemporaneous billing records are not required, legally-sufficient evidence to establish a reasonable and necessary fee needs to include a description of the particular services performed, the identity of each attorney who and approximately when that attorney performed the services, the reasonable amount of time required to perform the services, and the reasonable hourly rate for each attorney performing the services.

102

*See id.* (citing *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 497–98 (Tex. 2019)).

The unchallenged findings of fact regarding attorney's fees bind the parties and appellate court, unless the contrary is established as a matter of law or no evidence supports the findings. *See McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986); *In re R.M.T.*, No. 05-23-01164-CV, 2024 WL 5198702, at *8 (Tex. App.—Dallas Dec. 23, 2024, no pet.) (mem. op.). We will defer to unchallenged findings of fact that are supported by some evidence. *See Tenaska Energy, Inc. v. Ponderosa Pine Energy, LLC*, 437 S.W.3d 518, 523 (Tex. 2014).

Coffman testified that she was board certified in family law. She explained that she represented Mother in a contested custody modification for almost three years, and Mother signed a contract with Coffman's firm in January 2020. Coffman testified that her hourly rate was $350 per hour, and her paralegal's hourly rate was $125 per hour. She testified that she was familiar with the customary rates charged in Jefferson County, and their rates were "usual and customary . . . for family law cases of this complexity."

Coffman said she billed 436.5 hours for a total of $152,775, and her legal assistants have billed 49.75 hours totaling $6,711.25, so her firm's total fees billed to Mother were $159,486.25 Coffman described there were multiple hearings, including a three-day hearing in February 2020 on Mother's emergency motion for

temporary orders, which the court granted. She also outlined at least four other hearings, what motions they were on, when they occurred, and testified there were two pretrial hearings before the final hearing. She also described preparing for and representing Mother for a week-long jury trial in August 2022 and spending an additional thirty-five hours responding to Father's mandamus in June 2021, conducting extensive discovery, preparing discovery responses, responding to Father's motion to recuse, taking hours to review and organize text messages produced for trial, interviewing witnesses, preparing exhibit lists, subpoenas, and a jury charge for trial, among other things. Coffman outlined the work her legal assistants did, including organizing documents for discovery responses, drafting discovery, and organizing thousands of videos produced by Father. She also said Mother incurred fees for transcripts, Westlaw, and copies of $1,451.05.

Finally, Coffman testified that fees and expenses incurred were reasonable and necessary considering the time required over a three-year period, Father's practices, fees customarily charged in the county for similar services, the novelty and difficulty of the issues, experience, representation, ability of the lawyers, and results obtained. She also testified that accepting employment in this case precluded her from taking other matters.

Additionally, Mr. Peterson testified his hourly rate was $300 and his paralegal's rate was $80. He explained he spent 257.2 hours at $300 per hour for a

fee of $77,160.00, and his assistant spent 47 hours at $80 for a fee of $3,760.00. He asked that the trial court adopt the detailed summary of work provided by Coffman. Peterson then provided details of the work, Father's practices that made it difficult, and that there were eleven days of hearings in this case. He also provided a breakdown of expenses Mother incurred in the litigation process totaling $14,245.42. Peterson asked that his firm be awarded a total of $95,165.42 for "reasonable and necessary attorney's fees and expenses incurred" in representing Mother.

As to additional attorney's fees, Coffman testified that responding to a motion for new trial by Father would require approximately ten hours at her rate of $350 per hour, so she was seeking $3,500 in the event Father filed an unsuccessful motion for new trial. She explained that if Father appeals and Mother must file a brief it will require 30 hours of work at $350 per hour and requested those fees if Father filed an unsuccessful appeal.

The attorneys' testimony as described above included their hourly rates, their assistants' hourly rates, the amount of time each person spent at those hourly rates, the factors to consider in whether the fee was reasonable, the tasks performed and approximately when they were performed. *See Rohrmoos Venture*, 578 S.W.3d at 497–98; *In re K.A.M.S.*, 583 S.W.3d at 349. Accordingly, the record shows that the trial court's findings were supported by some evidence and that Father failed to

establish the contrary as a matter of law. *See id.*; *McGalliard*, 722 S.W.2d at 696; *In re R.M.T.*, 2024 WL 5198702, at *8; *see also Lynch*, 595 S.W.3d at 683; *In re A.E.A.*, 406 S.W.3d at 414. The trial court did not abuse its discretion in awarding Mother attorney's fees as specified in its Order. *See* Tex. Fam. Code Ann. § 106.002; *Bruni*, 924 S.W.2d at 368. We overrule issues seven and eight.

## V. Conclusion

Having overruled all of Father's issues, we affirm the trial court's Order in all respects.

AFFIRMED.

W. SCOTT GOLEMON
Chief Justice

Submitted on October 3, 2024
Opinion Delivered February 27, 2025

Before Golemon, C.J., Johnson and Wright, JJ.